1  JOHN L. SLAFSKY, State Bar No. 195513
   DAVID H. KRAMER, State Bar No. 168452
2  HOLLIS BETH HIRE, State Bar No. 203651
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone:  (650) 493-9300
5  Facsimile:   (650) 493-6811
   jslafsky@wsgr.com
6  dkramer@wsgr.com
   hhire@wsgr.com
7

8  Attorneys for Defendant
   GODADDY.COM, INC.
9

10              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
11

12  PETROLIAM NASIONAL BERHAD,          )   CASE NO:  09-CV-5939 PJH
                                        )
13            Plaintiff,                )   **REPLY IN FURTHER SUPPORT
                                        )   OF DEFENDANT'S MOTION FOR
14       vs.                            )   JUDGMENT ON THE PLEADINGS
                                        )   AND FOR AN ORDER FINDING
15  GODADDY.COM, INC.,                  )   PLAINTIFF LIABLE FOR FEES**
                                        )
16            Defendant.                )   DATE: September 8, 2010
                                        )   TIME:  9:00 a.m.
17  _____   )   JUDGE:  Hon. Phyllis J. Hamilton

18

19

20

21

22

23

24

25

26

27
                                                                    4088743v2
28  REPLY IN FURTHER SUPPORT OF
    DEFENDANT'S MOTION FOR JUDGMENT
    ON THE PLEADINGS AND FOR AN ORDER
    FINDING PLAINTIFF LIABLE FOR FEES
    Case No:  09-CV-5939 PJH

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II. PLAINTIFF HAS NOT OFFERED – AND CANNOT OFFER – A VIABLE
    CLAIM AGAINST GO DADDY ...............................................................................2

    A.  Go Daddy Is Unquestionably the Passive Registrar of the Domain Name .............2

        1.  The fact that the Domain Name was transferred from another
            registrar to Go Daddy does not alter Go Daddy's role as a passive
            registrar.........................................................................................................3

        2.  Labeling Go Daddy's routing function as an "affiliation" function,
            or a "forwarding" function does not change the fact that it is merely
            the routing function of a domain name registrar .........................................4

        3.  Describing how the routing is performed (through an "online
            dashboard") does not transform the function into anything other than
            the mere routing function of a domain name registrar .................................6

    B.  A Domain Name Registrar Is Not Liable for Cybersquatting................................6

        1.  Plaintiff has not stated a claim for direct or contributory
            cybersquatting ...............................................................................................6

        2.  Plaintiff cannot state a claim for direct or contributory
            cybersquatting ...............................................................................................7

            a)  Plaintiff cannot manufacture contributory liability based on
                Go Daddy's domain name routing function.......................................7

            b)  Plaintiff cannot claim direct liability for cybersquatting
                against a domain name registrar......................................................10

    C.  A Registrar Is Not Liable for Direct or Contributory Trademark
        Infringement or Dilution ....................................................................................11

    D.  Plaintiff Concedes that the State Claims Fall when the Federal Claims Fall........12

    E.  Amendment Would Be Futile ..............................................................................12

III. PLAINTIFF IS LIABLE FOR ATTORNEYS' FEES................................................12

    A.  Plaintiff's Complaint Was Groundless and Unreasonable....................................13

    B.  Plaintiff's Lawsuit Is Vexatious and Pursued in Bad Faith .................................14

IV. CONCLUSION ........................................................................................................15

4088743v2

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No:  09-CV-5939 PJH

## TABLE OF AUTHORITIES

**Page**

### CASES

*Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002)............................................................. 10

*Black v. Google*, No. 10-02381 CW, 2010 WL 3222147 (N.D. Cal. Aug. 13, 2010) .................... 5

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002)........................................ 13

*D.S.P.T. Int'l, Inc. v. Nahum*, No. CV-06-0308 *ODW*, 2008 WL 754803
    (C.D. Cal. March 17, 2008)..................................................................... 13, 14

*Fare Deals Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678 (D. Md. 2001).......... 9, 10

*Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635 (E.D. Mich. 2001)............... 7, 8

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648
    (N.D. Tex. 2001) ................................................................... 4, 7, 9, 11

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980
    (9th Cir. 1999)................................................................. 2, 3, 4, 8, 11, 12

*Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074 (9th Cir. 1990) ...................... 12

*Otis Clap & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738 (7th Cir. 1985) .................. 15

*Perfect 10 v. Visa Int'l Service Ass'n*, 494 F.3d 788 (9th Cir. 2007) .......................... 8

*Rohr-Gurnee Motors, Inc. v. Patterson*, No. 03-c-2493, 2004 WL 422525
    (N.D. Ill. Feb. 9, 2004) ........................................................................ 14

*Size, Inc. v. Network Solutions, Inc.*, 255 F. Supp. 2d 568 (E.D. Va. 2003)..................... 3

*Societe Civile Succession Guino v. Renior*, 305 Fed. Appx. 334 (9th Cir. April 1, 2009) .......... 14

*Solid Host, NL v. NameCheap*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009) ...................... 2, 7, 9

### STATUTES

15 U.S.C. § 1114(2)(D) (iii)......................................................................... 3, 10

15 U.S.C. § 1117 ......................................................................................... 12

15 U.S.C. § 1125(d) .................................................................................... 7, 9

### MISCELLANEOUS

4 Callmann on Unfair Competition, Trademarks and Monopolies
    §§ 22:37-38 (4th ed. 2010) .................................................................. 13, 14

4 McCarthy on Trademarks and Unfair Competition § 25:73.40 (4th ed. 2010).................... 13, 14

4088743v2

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No: 09-CV-5939 PJH

Internet and Online Law § 7.07[1][d] (3d ed. 2009)   ................................................................ 14

-iii-

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No:  09-CV-5939 PJH

1

## I.  INTRODUCTION

2          Plaintiff Petroliam Nasional Berhad ("Plaintiff") is attempting to go back in time more

3    than 10 years and re-write the law of the Internet.  Congress created a safe harbor for domain

4    name registrars in matters such as this one, and courts have applied the safe harbor repeatedly.

5    An entire multi-billion dollar industry has been built around that law, complete with dispute

6    resolution proceedings for the fast and efficient disposition of trademark disputes.  Regardless,

7    when Plaintiff discovered an allegedly infringing domain name at petronastower.net (the

8    "Domain Name") it chose – and continues to choose – not to take advantage of the streamlined

9    dispute resolution process.  Instead Plaintiff seeks to turn black-letter law on its head by forcing

10   Defendant GoDaddy.com ("Go Daddy") to perform the very trademark arbitration and policing

11   duties that the congressionally-mandated safe harbor was designed to prevent.

12         It is hornbook law that domain name registrars are not liable for the cybersquatting,

13   infringement, and dilution claims in Plaintiff's Complaint.  This is particularly so where, as here,

14   Go Daddy merely provided the registrant of the Domain Name (the "Registrant") the classic

15   routing function of a domain name registrar.  If Plaintiff had performed even a cursory review of

16   the case law (or even a treatise discussing the case law), it would have learned that the arguments

17   and theories it is now putting forth were offered by other trademark owners over a decade ago and

18   were uniformly rejected.

19         In the face of overwhelming authority as to the baselessness of its claims, Plaintiff has

20   aggressively over-litigated this action at every available opportunity, starting with a Christmas

21   Eve TRO motion filed at the time of the Complaint, even though the allegedly infringing website

22   had been in place in substantially the same form for over six years.  Since then, Plaintiff has filed

23   multiple federal lawsuits and now aggressively defends this motion for judgment on the pleadings

24   – and even requests an opportunity to amend the Complaint – even though amendment is futile,

25   and even though Plaintiff does not dispute that *the Domain Name was already transferred to*

26   *Plaintiff*, months ago.  The combination of Plaintiff's groundless and unreasonable claims, as well

27

28

-1-

4088743v1

as its vexatious behavior in multiplying this litigation, subjects Plaintiff to liability for attorneys' fees under the Lanham Act.

## II.  PLAINTIFF HAS NOT OFFERED – AND CANNOT OFFER – A VIABLE CLAIM AGAINST GO DADDY

### A.  Go Daddy Is Unquestionably the Passive Registrar of the Domain Name

Plaintiff does not dispute that a registrar acting as a registrar is not liable for any of the claims in the Complaint.  Plaintiff instead argues, feebly, that Go Daddy somehow was not acting merely as a registrar.  With this argument, Plaintiff attempts to remove this case from the binding precedent of *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999), and manipulate it into the specific circumstances of *Solid Host, NL v. NameCheap*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009), where the Central District allowed a contributory cybersquatting action against the defendant to survive a motion to dismiss.  Notably, in *Solid Host*, the Complaint only survived the motion to dismiss because the registrar defendant was not acting merely as a registrar; it provided an additional service – an anonymity service that concealed the identity of the true registrant and listed the defendant registrar as the registrant in public databases.[1]  In this case, Go Daddy did not provide the Registrant with anything other than the domain name routing services of a registrar, and Plaintiff's arguments do not establish otherwise.  Instead of any credible argument – which Plaintiff could not make consistent with Rule 11 – Plaintiff offers a series of red herrings.[2]  Plaintiff's arguments are desperate ploys to create ambiguity where there is none, and must be disregarded.

---

[1] The relationship between the players in *Solid Host* is also highly distinct from the present case. In *Solid Host*, the plaintiff alleged that a third party hacked into a domain name registrar's system and hijacked control of the domain name that plaintiff owned and was using. 652 F. Supp. 2d at 1097. The plaintiff then alleged that the cyber-hacker hid its identity by engaging the defendant's anonymity service. *Id.* These circumstances are fundamentally different from a garden-variety cybersquatting case such as this one.

[2] Plaintiff does not point to any language in the Complaint that can be interpreted to advance any of its newly-offered theories that Go Daddy was not a passive registrar. Indeed it cannot: the

(continued...)

-2-

4088743v2

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No: 09-CV-5939 PJH

**1.  The fact that the Domain Name was transferred from another registrar to Go Daddy does not alter Go Daddy's role as a passive registrar**

Plaintiff argues, disingenuously, that because Go Daddy was not the first registrar for the Domain Name, somehow it was not acting merely as a registrar.  Opp. at 3.  The plain language of the Anticybersquatting Protection Act ("ACPA") makes clear that registration of a domain name is not the only protected act of a registrar.  The safe harbor specifically states that "[a] domain name registrar . . . shall not be liable for damages under this section for the registration *or maintenance* of a domain name . . . ."  15 U.S.C. § 1114(2)(D)(iii) (emphasis added).  If the protected activity of a registrar was limited to initial "registration" of the domain name only, as Plaintiff suggests, then the language "or maintenance" would be meaningless.  In fact, numerous cases have discussed the various protected functions of a domain name registrar, which include routing the registrants' domain names to the website of the registrants' choice.  *See, e.g.*, *Lockheed*, 194 F.3d at 984 ("[The registrar's] role differs little from that of the United States Postal Service: when an Internet user enters a domain-name combination, [the registrar] translates the domain-name combination to the registrant's IP Address and routes the information or command to the corresponding computer.").  *See also, e.g.*, *Size, Inc. v. Network Solutions, Inc.*, 255 F. Supp. 2d 568, 573 (E.D. Va. 2003) ("[The defendant registrar] is simply a routing service, and does not supply domain name combinations any more than the Postal Service supplies street addresses.").  In both *Lockheed* and *Size*, the registrar performing this routing function was not liable under the Lanham Act.

The fact that the Domain Name was entrusted to another registrar at the time of initial registration does not alter the character of what Go Daddy did with the Domain Name – the same mere routing function discussed in *Lockheed* and provided by all registrars as part of their basic

_____

(...continued from previous page)
*only* language in the Complaint that sets out Go Daddy's role with respect to the Domain Name states that the "[Domain Name] had been registered with Defendant, GoDaddy."  Complaint ¶ 15.

4088743v2

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No:  09-CV-5939 PJH

1    registrar service.  *See Lockheed*, 194 F.3d at 984.  Indeed, transfer of domain names between

2    registrars is commonplace, and registrars are required to facilitate these transfers at the request of

3    registrants.   To operate, registrars must receive accreditation from and follow the policies of the

4    Internet Corporation for Assigned Names and Numbers ("ICANN"), "a non-profit corporation that

5    governs the Internet," *Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 651

6    (N.D. Tex. 2001) ("*Lockheed II*").  ICANN's policy encourages the easy transfer of domain names

7    from one registrar to another: "Consistent with ICANN's obligation to promote and encourage

8    robust competition in the domain name space, the Inter-Registrar Transfer Policy aims to provide

9    a straightforward procedure for the domain name holders to transfer their names from one

10   ICANN-accredited registrar to another should they wish to do so." *See* Declaration of Hollis Hire,

11   ¶ 2, Ex. A (ICANN Inter-Registrar Transfer Policy).   The transfer of the Domain Name from

12   another ICANN-accredited registrar to Go Daddy does nothing to change Go Daddy's role as a

13   passive registrar.

**2.   Labeling Go Daddy's routing function as an "affiliation" function, or a "forwarding" function, does not change the fact that it is merely the routing function of a domain name registrar**

16   Plaintiff attempts to restate the routing function of the domain name registrar in different

17   words, hoping that this meaningless re-labeling will transform Go Daddy's function into

18   something other than a passive registrar.  These efforts must fail.

19   Specifically, Plaintiff accuses Go Daddy of "affiliating" the allegedly infringing website

20   with the Domain Name.  Opp. at 5.  Affiliation of the Domain Name with the registrant-selected

21   website is simply the necessary and obvious result of a domain name registrar's routing function.

22   Plaintiff further argues that Go Daddy provided a "forwarding" function, and that this is

23   something other than the act of a passive registrar.  Opp. at 14.  On the contrary, forwarding

24   domain names is well within the routing service of a traditional domain name registrar, just as

25   forwarding mail is within the delivery service of the Post Office.  "Forwarding" a domain name to

26   a website at a different domain name is merely one of the routing options available to any

27

28

4088743v2

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No:  09-CV-5939 PJH

1  registrant at any registrar, as an alternative to developing a new website for each domain name.

2  Many registrants choose to route more than one domain name to a single website.  For example,

3  the domain names <www.nyt.com>, <www.nytimes.com>, and <www.newyorktimes.com> are all

4  routed to the New York Times website, which resides at <www.nytimes.com>.  Here, now that

5  Plaintiff owns the Domain Name, it may choose to forward the domain name to its own official

6  website.  To do so it would simply log into its account at Go Daddy (or another ICANN-

7  accredited registrar if it chooses to transfer the Domain Name), and enter the destination website at

8  www.petronas.com.my.  Such a direction would not appoint Go Daddy to any role other than

9  Plaintiff's registrar.

10         Coy wordplay is not an effective means of separating a defendant from its statutory

11  immunity.  In *Black v. Google*, No. 10-02381 CW, 2010 WL 3222147 (N.D. Cal. Aug. 13, 2010),

12  plaintiffs sought to hold the search engine defendant liable for claims based on negative reviews of

13  the plaintiffs' roofing business that third parties posted on the defendant's website.  Defendant

14  moved to dismiss pursuant to § 230 of the Communications Decency Act, which provides

15  immunity to internet service providers who face claims accusing them of being the "speaker" or

16  "publisher" of third party content.  *Id.* at *2.  Plaintiffs argued in response that their claim was

17  based on the defendant's role as the sponsor or endorser of the content, by virtue of displaying the

18  content on its site.  *Id.* at *3.  The Court emphatically rejected Plaintiff's attempts to re-label the

19  function of the defendant in an effort to remove it from statutory immunity: "Plaintiffs' attempt to

20  depict Defendant as a sponsor or endorser of the comment is, in effect, an end-around the

21  prohibition on treating it as a publisher or speaker of it.  Such a ploy, if countenanced, would

22  eviscerate the immunity granted under § 230."  *Id.*  Plaintiff's ploy should be treated no

23  differently.

24

25

26

27

28

-5-

4088743v2

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No:  09-CV-5939 PJH

**3. Describing how the routing is performed (through an "online dashboard") does not transform the function into anything other than the mere routing function of a domain name registrar**

Plaintiff also attempts to make something of Go Daddy's "online dashboard," which is the means Go Daddy provides for registrants to route the domain names in their control to a particular Internet address, or website. Opp. at 7, 11, 14. This argument is merely another attempt to re-label the routing function of a registrar by describing instead the means of providing the function.

To provide registrar services to approximately 40 million domain names, Go Daddy must employ a user-controlled, automated system for registrant customers to designate the website destinations for their domain names, without involvement from Go Daddy personnel. The "online dashboard" is nothing other than the interface that allows the Registrant to point the Domain Name to a particular website. *See* Decl. of Kelly Lewis in support of Defendant's Opp. to TRO, ¶ 7. Plaintiff does not argue – nor could it – that Registrant used the online dashboard for anything other than the designation of the destination website for the Domain Name. As such, it was merely the technical means of accomplishing the domain name routing function of a registrar.

Plaintiff has not alleged or argued any theory that transforms Go Daddy from the role of a domain name registrar. Plaintiff does not dispute that its claims cannot lie against a domain name registrar acting as a registrar, and therefore the Complaint should be dismissed without leave to amend.

**B. A Domain Name Registrar Is Not Liable for Cybersquatting**

**1. Plaintiff has not stated a claim for direct or contributory cybersquatting**

Plaintiff focuses a great deal of its argument on an attempt to mold a contributory cybersquatting claim from the direct cybersquatting claim alleged against "The registrant, host, or registrar of the Infringing Domain Name, including Go Daddy."[3]  *See, e.g.* Complaint ¶ 30.

---

[3] Plaintiff stridently accuses Go Daddy of giving short shrift to the claim in its Motion, *see* Opp. at 3, when, in fact, the phrase "contributory cybersquatting" is only mentioned once, in a heading, within the Complaint. *See* Complaint at 6.

-6-

4088743v2

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No:  09-CV-5939 PJH

Strikingly, Plaintiff did not make any allegations in the Complaint that Go Daddy intentionally induced cybersquatting, that Go Daddy exercised direct control and monitoring over the instrumentality that the Registrant used to engage in cybersquatting, or that Go Daddy had knowledge of the particular instance of cybersquatting.[4]

### 2. Plaintiff cannot state a claim for direct or contributory cybersquatting

#### a) Plaintiff cannot manufacture contributory liability based on Go Daddy's domain name routing function

Even if Plaintiff had included allegations that Go Daddy controlled the means of the cybersquatting and had knowledge of cybersquatting in the Complaint, which it did not, such claims would be barred by longstanding and binding interpretations of the ACPA. It is well-settled that a domain name registrar acting as a registrar cannot be held liable for contributory cybersquatting. *See Solid Host*, 652 F. Supp. 2d at 1104 ("[A] registrar is not liable under § 1125(d) *when it acts a registrar*.") (emphasis in original). As Go Daddy acted only as the registrar for the Domain Name, it is not liable for contributory cybersquatting or any other claim under 15 U.S.C. § 1125(d).

Plaintiff nonetheless argues that Go Daddy exercised control over the means of cybersquatting by "making the infringing website accessible through the infringing [Domain Name]," and by "acts of affiliating the infringing domain name with the infringing website." Opp. at 5. As discussed above, these activities merely constitute the routing function of a domain name registrar, and do not subject Go Daddy to liability under the ACPA. Attempting to support its untenable position, Plaintiff mischaracterizes the *Solid Host* decision and several others.

---

[4] Plaintiff argues that its demand letters provided Go Daddy the knowledge required for contributory liability. *See* Opp. at 8. However, such letters are not sufficient to satisfy the knowledge requirement, as Go Daddy cannot be charged with discerning whether its tens of millions of registrant customers exhibit bad faith intent to profit from a trademark – the statutory prerequisite to cybersquatting liability. *See Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635, 647 (E.D. Mich. 2001) ("[A]n entity such as [defendant auction house] generally could not be expected to ascertain the good or bad faith intent of its vendors."); *see also Lockheed II*, 141 F. Supp. at 655 ("The fact that defendant could theoretically [resolve disputes] does not mean that defendant is obligated to do so at the risk of financial ruin.").

4088743v2

REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No: 09-CV-5939 PJH

1         For example, Plaintiff cites *Ford*, 177 F. Supp. 2d at 646, claiming that the court "appl[ied]

2    [the] principles of contributory trademark infringement to contributory cybersquatting." Opp. at

3    4. On the contrary, the *Ford* court specifically rejected the application of the contributory

4    trademark infringement analysis to a contributory cybersquatting claim: "because the ACPA

5    requires a showing of 'bad faith intent' – a subjective element not required under traditional

6    infringement, unfair competition, or dilution claims – the standard would be somewhat

7    heightened." 177 F. Supp. 2d at 647. In addition, Plaintiff also fails to disclose that *Ford* did not

8    concern a domain name registrar, but rather a domain name auction house. *See id.* Regardless,

9    the court held that the domain name auction house was *not* liable for direct or contributory

10   cybersquatting, in part because "an entity such as Great Domains generally could not be expected

11   to ascertain the good or bad faith intent of its vendors." *Id.*

12        Plaintiff also relies on *Perfect 10 v. Visa International Service Ass'n*, 494 F.3d 788, 807

13   (9th Cir. 2007), for the proposition that "[w]hen the alleged infringer supplies a service [such as a

14   website] rather than a product, the Court must consider the extent of control exercised by the

15   defendant over the third party's means of infringement." Opp. at 4. Plaintiff does not reveal that

16   this sentence in *Perfect 10 v. Visa* is quoted directly from the Ninth Circuit decision in *Lockheed*.

17   Both *Lockheed* and *Perfect 10* courts went on to find that the service at issue did not have the

18   requisite level of control to trigger secondary liability for trademark infringement. "While the

19   landlord of a flea market might reasonably be expected to monitor the merchandise sold on his

20   premises, [defendant domain name registrar] cannot reasonably be expected to monitor the

21   Internet." *Perfect 10*, 494 F.3 at 807 (quoting *Lockheed*, 194 F.3d at 985).[5]

22

23

---

24      [5] Undeterred by direct quotations in the cases that Plaintiff itself cites stating that a domain
     name registrar is not analogous to a landlord of a flea market, Plaintiff argues that Go Daddy is
25   analogous to a landlord at a flea market. *See* Opp. at 6. This very characterization was attempted
     – and failed – in the *Lockheed* cases over a decade ago, and Plaintiff presents no reason why the
26   binding precedent should (or could) be disregarded in this case.

27
                                                              -8-                                    4088743v2
28   REPLY IN FURTHER SUPPORT OF
     DEFENDANT'S MOTION FOR JUDGMENT
     ON THE PLEADINGS AND FOR AN ORDER
     FINDING PLAINTIFF LIABLE FOR FEES
     Case No:  09-CV-5939 PJH

1        Plaintiff relies heavily on *Solid Host* and *Fare Deals Ltd. v. World Choice Travel.com,*

2    *Inc.*, 180 F. Supp. 2d 678 (D. Md. 2001); neither case is applicable, and in any event they do not

3    support Plaintiff's position. Opp. at 5-6. As discussed above, *Solid Host* involved an anonymity

4    service, which is not at issue here. In fact, it is strikingly clear from the *Solid Host* decision itself

5    that had the defendant merely been providing the registration and routing function of a registrar,

6    *Lockheed* would have governed and the motion to dismiss would have been granted. *See Solid*

7    *Host*, 652 F. Supp. 2d at 1104 ("[where] a defendant did nothing more than act as a registrar, no

8    liability under § 1125(d) will lie.") (citing *Lockheed II*, 141 F. Supp. 2d at 655).

9        Plaintiff's reliance on *Fare Deals* is also misleading and misplaced. Like *Solid Host, Fare*

10   *Deals* did not concern the routing function of a domain name registrar, or indeed any registrar at

11   all. *See Fare Deals Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678 (D. Md. 2001).

12   *Fare Deals* instead concerned affiliate companies of an alleged cybersquatter, and even in this

13   context the court held that the plaintiff did not state a claim for contributory cybersquatting.

14   Contrary to Plaintiff's assertion, the *Fare Deals* court did not hold that "contributory

15   cybersquatting occurs where, had the defendant ceased providing its services related to the

16   infringing domain name, the cybersquatting would have ceased." Opp. at 6. Rather, the opinion

17   held that the defendant was not liable for contributory cybersquatting for multiple reasons. In

18   rejecting the plaintiff's argument that the affiliate was analogous to a flea market operator, the

19   court pointed out that, among other things, the defendant was unlike a flea market operator

20   because "if [defendant] severed its link to [the cybersquatter], the infringement could readily

21   continue." *Fare Deals*, 180 F. Supp. 2d at 690. This statement does not mean, as Plaintiff

22   argues, that the converse is true, i.e., that every instance where "severing a link" would stop the

23   allegedly infringing activity gives rise to contributory liability. The court also noted that the

24   defendant was unlike a flea market operator in that it did not "steer[] customers toward nor

25   advertise[] the site." *Id.* Citing *Lockheed*, the *Fare Deals* court further observed that "Like [the

26   defendant registrar] NSI in *Lockheed Martin*, [defendant] neither provided a product to the

27   owners or operators of the web site nor directly controlled and monitored the site in a manner

-9-                                                                          4088743v2

28   REPLY IN FURTHER SUPPORT OF
     DEFENDANT'S MOTION FOR JUDGMENT
     ON THE PLEADINGS AND FOR AN ORDER
     FINDING PLAINTIFF LIABLE FOR FEES
     Case No: 09-CV-5939 PJH

1  sufficient to justify expansion of the … [contributory liability standard] to include [defendant's]

2  activity." *Id.* at 689.  Therefore, Plaintiff's reference to *Fare Deals* not only misstates the holding

3  of the case, but also fails to recognize that the decision only reinforces the well-established shield

4  from liability for domain name registrars like Go Daddy.

5                           **b)  Plaintiff cannot claim direct liability for cybersquatting against a domain name registrar**

6

7        Plaintiff acknowledges that a direct cybersquatting claim must allege that the defendant

8  registered, trafficked in, or used a domain name with bad faith intent to profit from the goodwill

9  associated with the plaintiff's trademark.  Opp. at 10-12.  Plaintiff therefore attempts to argue that

10  Go Daddy's routing function constituted a "use" of the domain name with bad faith intent to

11  profit.[6]  Such efforts are unavailing, as the statute's safe harbor prohibits such claims against a

12  registrar, *see* 15 U.S.C. § 1114(2)(D)(iii), and in any event Go Daddy's conduct is well outside

13  the scope of "use" contemplated in the statute.

14        Plaintiff recognizes that the ACPA itself limits "use" of a domain name to the registrant

15  and the registrant's "authorized licensee."  Plaintiff advances a far-fetched argument that Go

16  Daddy should be considered the "authorized licensee" of the registrant under the ACPA.  *See*

17  Opp. at 10.  This theory is not set forth in the Complaint, but Plaintiff argues that such a theory

18  can be "reasonably inferred" from the allegation in paragraph 15 that "Go Daddy is the

19  'registrar,' not the 'registrant,' of the [Domain Name]."  Opp. at 10.  Plaintiff does not present

20  any support for this wildly broad interpretation of the "authorized licensee" requirement in the

21  ACPA, nor has it provided any authority to excuse it from asserting an allegation in the

22  Complaint.  On the contrary, courts have dismissed complaints against defendants when the

23  complaint failed to allege specifically that the defendant was the registrant's "authorized

24  licensee."  *See, e.g., Bird v. Parsons*, 289 F.3d 865, 881 (6th Cir. 2002).

25

26     [6] Plaintiff does not dispute Go Daddy's arguments in its Motion that Go Daddy did not "register" or "traffic in" the Domain Name.

27

28  REPLY IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND FOR AN ORDER FINDING PLAINTIFF LIABLE FOR FEES
Case No: 09-CV-5939 PJH

-10-

4088743v2

1      Plaintiff's argument regarding Go Daddy's supposed "bad faith intent to profit" is equally

2  insufficient.  As Go Daddy predicted in its Motion, Plaintiff bases its argument primarily on Go

3  Daddy's alleged failure to take any action in response to Plaintiff's emails explaining its position

4  that the website at the Domain Name was infringing.  *See* Motion at 7-9.  As discussed in detail in

5  the Motion, Go Daddy did respond to Plaintiff, and advised repeatedly and appropriately that

6  Plaintiff should seek redress from the Registrant.  This response does not amount in any way to

7  "bad faith intent to profit" from the goodwill associated with Plaintiff's trademark.

8      Plaintiff also attempts to construe Go Daddy's routing function as "bad faith intent to

9  profit" under the ACPA.  Plaintiff cites no authority for this wild assertion; all authority on point

10  directly contradicts Plaintiff's argument.  *See, e.g., Lockheed II*, 141 F. Supp. 2d at 654-55

11  ("[Defendant Registrar did not have] bad faith intent to profit from specific marks . . . none of the

12  conditions and conduct listed [in the ACPA] would be applicable to a person functioning solely as

13  a registrar . . . of domain names.").

### C. A Registrar Is Not Liable for Direct or Contributory Trademark Infringement or Dilution

16  Other than a re-hashing of its earlier statements, Plaintiff does not present any argument to

17  support its assertion that Go Daddy is liable for trademark infringement and dilution.  Plaintiff

18  claims that the Complaint contained allegations that Go Daddy "used the [Domain Name] to divert

19  customers from [Plaintiff's] website to the Infringing Website accessible under the infringing

20  domain name."  However, the "diversion of customers" that makes up the basis of Go Daddy's

21  supposed "use" of the website is merely the routing function of a domain name registrar.  Plaintiff

22  tries to distinguish Go Daddy's role with respect to the Domain Name from the registrar's role in

23  *Lockheed*, but that registrar – like Go Daddy and all other registrars – was not only involved in the

24  registration and assignment of the domain name to the registrant.  The registrar also "translate[d]

25  the domain-name combination to the registrant's IP Address and route[d] the information or

26  command to the corresponding computer."  *Lockheed*, 194 F.3d at 984.  It is disingenuous of

27  Plaintiff to try to cast *Lockheed* as "limit[ing]" the defendant registrar's role "to the mere

-11-                                                                4088743v2

28  REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No:  09-CV-5939 PJH

1  'translation of the domain name combination … by an internet user,'" Opp. at 14.  Far from

2  limiting the role of the registrar to a "translation" function, the Court explained – immediately

3  following the snippet that Plaintiff provided in the very same sentence – that the registrar-

4  defendant also "routes the information or command to the corresponding computer." *See*

5  *Lockheed*, 194 F.3d at 984.

6  **D.  Plaintiff Concedes that the State Claims Fall when the Federal Claims Fall**

7  Plaintiff does not dispute Go Daddy's assertions that the state law claims are entirely

8  dependent on the federal law claims, and that the dismissal of the federal claims thereby

9  necessitates the dismissal of the state claims as well. *See* Opp. at 15.  As the federal

10 cybersquatting, infringement, and dilution claims must fail for the reasons stated in Go Daddy's

11 Motion and above, the state law claims must also fail. *See* Motion at 13.

12 **E.  Amendment Would Be Futile**

13 Plaintiff does not propose specific amendments to its Complaint, so there are no particular

14 amendments to evaluate.  Regardless, as explained above and given the facts of the case,

15 amendment would be futile with respect to every claim in the Complaint. "Where the legal basis

16 for a cause of action is tenuous, futility supports the refusal to grant leave to amend." *See*

17 *Lockheed*, 194 F.3d at 986 (citing *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079

18 (9th Cir. 1990)).  Plaintiff's Complaint should be dismissed in its entirety, and without leave to

19 amend.[7]

20 **III.   PLAINTIFF IS LIABLE FOR ATTORNEYS' FEES**

21 Plaintiff does not dispute that attorneys' fees are available to prevailing defendants in

22 Lanham Act cases under 15 U.S.C. § 1117.  A defendant can show that the case is "exceptional,"

23 and that the Plaintiff should be liable for fees, when the action is "groundless, unreasonable,

24

25     [7] In the past few months, and even at the August 5, 2010 Case Management Conference held after Go Daddy's Motion was filed, Plaintiff has taken the position that the deadline for parties to amend pleadings passed in April 2010. *See* Second CMC Statement at 5.

26

27

4088743v2

28 REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No: 09-CV-5939 PJH

1  vexatious, or pursued in bad faith." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir.

2  2002). Every one of these factors applies in the instant case.

3  **A. Plaintiff's Complaint Was Groundless and Unreasonable**

4  Plaintiff's Opposition fails to substantiate even one element of one claim against Go

5  Daddy. Plaintiff does not dispute in its Opposition that its claims are barred against a domain

6  name registrar acting as a registrar, and therefore it tries – unsuccessfully – to re-label Go Daddy

7  as something other than a mere domain name registrar. Despite settled statutory and case law,

8  which Plaintiff now all but acknowledges, Plaintiff brought doomed cybersquatting, infringement

9  and dilution claims against Go Daddy solely based on the fact that "the [Domain Name] had been

10 registered with Defendant, GoDaddy." Complaint ¶ 15. Plaintiff even concedes in the

11 Opposition that this allegation – the only allegation in the Complaint that refers to Go Daddy's

12 role with respect to the Domain Name – is meant to refer to Go Daddy as "the registrar . . . of the

13 [Domain Name]." Opp. at 10.

14 Cursory review of virtually any treatise or case on this topic would have alerted Plaintiff to

15 the base deficiency in the Complaint. *See, e.g.*, 4 <u>McCarthy on Trademarks and Unfair</u>

16 <u>Competition</u> § 25:73.40 (4th ed. 2010) (ACPA provides registrars a "safe harbor from liability for

17 registering an infringing domain name."); 4 <u>Callmann on Unfair Competition, Trademarks and</u>

18 <u>Monopolies</u> §§ 22:37-38 (4th ed. 2010) ("A domain name registrar is not itself liable for

19 permitting registration of an offending domain name" and "a domain name registrar is not liable

20 under the ACPA for failing to screen out ACPA violations among the domain name registrations

21 which it accepts.").

22 Complaints even within this discreet area of the law have been found groundless based on

23 much less authority. *See D.S.P.T. Int'l, Inc. v. Nahum*, No. CV-06-0308 ODW, 2008 WL

24 754803, at *3 (C.D. Cal. March 17, 2008) (awarding fees to prevailing defendant in ACPA case

25 when "Notwithstanding the statute's directive that 'only' the registrant and his or her authorized

26 licensee may be held liable for 'use' of a domain name, [plaintiff] pursued this claim against

27 [defendant], who was neither the registrant of the domain name nor a licensee.").

-13-                                                                    4088743v2

28 REPLY IN FURTHER SUPPORT OF
   DEFENDANT'S MOTION FOR JUDGMENT
   ON THE PLEADINGS AND FOR AN ORDER
   FINDING PLAINTIFF LIABLE FOR FEES
   Case No: 09-CV-5939 PJH

1   Continuation of the action in the face of the overwhelming case law negating Plaintiff's

2   claims was unreasonable and subjects Plaintiff to liability for attorneys' fees. *See id.* at *3.

3   ("[Plaintiff's] pursuit of the [groundless] claims-including the blanket opposition to [defendant's]

4   motion for summary judgment, was unreasonable."). *See also Rohr-Gurnee Motors, Inc. v.*

5   *Patterson*, No. 03-c-2493, 2004 WL 422525, at *3 (N.D. Ill. Feb. 9, 2004) ("[A]fter the June 18

6   Hearing, [plaintiff's] continued pursuit of this [ACPA] case became 'oppressive,' because at that

7   hearing this court ruled, and [plaintiff] became aware, that it did not have a better than negligible

8   chance of success on the merits of its claim."). *See also Societe Civile Succession Guino v.*

9   *Renior*, 305 Fed. Appx. 334, 338 (9th Cir. April 1, 2009) ("[Plaintiff's] failure to dismiss its claim

10  earlier in the proceeding once it knew that there was no evidence to support it was

11  'unreasonable.'").

12  **B.  Plaintiff's Lawsuit Is Vexatious and Pursued in Bad Faith**

13  The same treatises that would have revealed decade-old case law on the subject of a

14  registrar's lack of liability for Plaintiff's claims would have educated Plaintiff about the Uniform

15  Domain Name Dispute Resolution Policy ("UDRP"), the recognized, streamlined procedure for

16  addressing garden-variety trademark disputes such as the one in this case. *See* 4 McCarthy §

17  25:74.75 ("[T]he UDRP process is designed to be a simple, quick and inexpensive method of

18  determining if a domain name has been the subject of cyber-squatting."); 4 Callmann § 22:36

19  ("Most domain name disputes currently are handled through the UDRP."); Internet and Online

20  Law § 7.07[1][d] (3d ed. 2009) ("ICANN's dispute resolution process has proven to be a popular

21  alternative to litigation for thousands of trademark owners.").

22  Instead of filing a UDRP action, which likely would have secured transfer of the Domain

23  Name by January 2010 (if Plaintiff had filed the proceeding when it allegedly first learned of the

24  website in November 2009), Plaintiff has filed three federal lawsuits, at least one motion

25  connection with each lawsuit, including a Christmas Eve TRO request for a website that had been

26  in place for over six years (denied on that basis and based on a failure to establish a likelihood of

27  success). In addition, Plaintiff's continued prosecution of the action has required the parties to

-14-

28  REPLY IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND FOR AN ORDER
FINDING PLAINTIFF LIABLE FOR FEES
Case No: 09-CV-5939 PJH

4088743v2

1  participate in two case management conferences with the attendant statements and conferences

2  between counsel, and has required parties to exchange initial disclosures.

3  Perhaps most strikingly, Plaintiff continues to prosecute this action even though it has

4  already received the relief requested: *the Domain Name was transferred to Plaintiff several*

5  *months ago* pursuant to an order in the first Lanham Act *in rem* action against the Domain Name.

6  Plaintiff does not even mention the prior transfer of the Domain Name in its Opposition, and does

7  not provide any explanation for its continued prosecution of this action, which is now not only

8  groundless, but also moot.  Such activities constitute vexatious multiplication of the proceedings,

9  and further confirm that Plaintiff's motivations in bringing and continuing this action are not

10  primarily to stop alleged online infringement of its trademarks.  If addressing infringement truly

11  was Plaintiff's concern, it would have pursued a UDRP proceeding to gain control of the Domain

12  Name within two months of discovering the Registrant's website.  Instead, Plaintiff has continued

13  vexatiously to pursue the litigation even after the Domain Name was transferred to Plaintiff.

14  Such conduct subjects Plaintiff to liability for attorneys' fees.  *See Otis Clap & Son, Inc. v.*

15  *Filmore Vitamin Co.*, 754 F.2d 738, 745-47 (7th Cir. 1985) (affirming the district court's award

16  of attorneys' fees to prevailing defendant in part because "after the concession of liability, the

17  costs to both parties were substantially and unnecessarily increased by plaintiff's litigation

18  strategy.").

## IV.  CONCLUSION

20  For the reasons stated above and stated in Go Daddy's Memorandum in Support of its

21  Motion for Judgment on the Pleadings and for an Order Finding Plaintiff Liable for Attorneys'

22  Fees, Go Daddy's Motion should be granted.

23  Dated:  August 25, 2010

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:  ___/s/ John L. Slafsky_____ .
        John L. Slafsky
        David E. Kramer
        Hollis Beth Hire
    Attorneys for Defendant
    GODADDY.COM, INC.

-15-

4088743v2