LAW OFFICES OF

# PERRY R. CLARK

825 SAN ANTONIO ROAD
PALO ALTO, CA 94303
TELEPHONE 650 248 5817
FACSIMILE 650 618 8533

October 26, 2011

**BY ELECTRONIC FILING**

Hon. Phyllis Hamilton
Oakland Courthouse
Courtroom 3 - 3rd Floor
1301 Clay Street
Oakland, CA 94612

> **Re:    *Petronas v. GoDaddy*, 09-CV-5939 PJH**

Dear Judge Hamilton,

We write regarding discovery disputes that have arisen in this cybersquatting and unfair competition case.  The parties met and conferred by telephone on October 26, 2011.  The parties submit this joint letter in light of your Honor's directions at the May 26, 2011 Case Management Conference at which the Court retained discovery (no referral) and directed that, "if there is a discovery dispute, counsel should submit a joint letter brief of dispute in a minimum amount of pages.  The Courtroom Deputy will contact counsel when/if a phone conference will be held as to a discovery issue." (Doc. No. 91).

The parties' respective positions on the dispute are set forth below.

*Petronas's Position*

Petronas submits this letter to request the Court's assistance in compelling two types of discovery from GoDaddy: Fed. R. Civ. P. 30(b)(6) deposition testimony and the production of documents.

Based on counsel's telephonic meet and confer discussions, Petronas understands that GoDaddy will be producing additional documents as soon as October 27, 2011 that may address the document issues raised below.  Petronas is, nonetheless, mindful of the 7-day deadline after the close of fact discovery (which, in this case, was October 19, 2011) in Civ. L.R. 37-3 for the filing of motions to compel and, accordingly, is filing this letter.  Petronas, however, will immediately review any documents produced by GoDaddy and inform the Court if they resolve the document issues below.  With respect to the deposition issues below, Petronas understands that GoDaddy believes that the Fed. R. Civ. P. 30(b)(6) topics in question were covered by other witnesses and that GoDaddy will provide citations to transcripts (in addition to those it already has

provided) along those lines.  While Petronas will review those transcripts to see if they resolve the issues below, Petronas notes that the testimony identified by GoDaddy as of the filing of this letter did not adequately cover the topics and was not from witnesses designated by GoDaddy for examination on those topics under Fed. R. Civ. P. 30(b)(6).

<u>Depositions</u>

GoDaddy's Fed. R. C. P. 30(b)(6) witnesses were unprepared to testify on the topics for which they were designated.  For example, GoDaddy designated Matthew Bilunes as its representative on Topic No. 1 in Petronas's Fed. R. Civ. P. 30(b)(6) notice of deposition, which is "[t]he 'trademark policy and how/whether the domain names were treated within it' and the 'general policies and procedures, the volume of incoming trademark complaints as well as the specific handling of the two disputed domain names' to which GoDaddy referred in the joint letter to the Court dated September 2, 2011 (Doc. No. 107)." [1]  Mr. Bilunes was unable to provide information related to Topic No. 1, as the following testimony illustrates:

Q.  Okay.  Do you know what policy was applied to the trademark claim submitted by Petronas in December 2009 to Go Daddy regarding the domain name petronastower.net?
A.  I do not.
Q.  Okay.  Do you know what policy was applied to the trademark claim submitted by Petronas in July 2010 related to the domain name petronastowers.net?
A.  I do not.

***

Q.  [D]o you understand that you've been designated as Go Daddy's representative on topic number 1 on page 7 in Exhibit 1 [Petronas's Fed. R. Civ. P. 30(b)(6) Deposition Notice]?
A.  Yes, I understand that I've been designated.
Q.  Okay.  So can you tell me how many incoming trademark complaints Go Daddy received in 2010?
A.  I cannot give you an approximate number.
Q.  You can give me an approximate number?
A.  Cannot.
Q.  Can you give me an approximate number for 2009?
A.  No, I cannot.
Q.  If you wanted to find out the number of incoming trademark complaints that Go Daddy had received for any specific period of time, how would you go about doing that?
A.  I would consult with our trademark claims people who handle the trademark complaints.
Q.  Okay.  And before your deposition today, did you consult with any of the people who handle the trademark claims?
A.  No, I did not.

---

[1]  The Court will recall that the September 2, 2011 Joint Letter (Doc. No. 107) involved Petronas's motion to compel GoDaddy to respond a document request (No. 5) regarding the number of trademark claims like those at issue in this case it receives (and which are part of Petronas's allegations of bad faith in its First Amended Complaint).  The Court denied Petronas's motion to compel "for the reasons stated by defendant" (Doc. No. 108), which included GoDaddy's representation in the September 2, 2011 Joint Letter that GoDaddy would provide a Fed. R. Civ. P. 30(b)(6) witness on the subject.

In addition, GoDaddy's designated deponent for Fed. R. Civ. P. 30(b)(6) Topic No. 7, Laurie Anderson, was also unprepared and unable to answer questions on that topic:

Q.  Okay.  And if you could just flip back to Exhibit 1 which is your deposition notice.  If you turn to page 8, you see numbered paragraph 7.  And do you understand that you've been designated as GoDaddy's 30(b)(6) deponent on topic 7 which is "Heiko Schoenekess, including services provided to him and communications with him?"
A.  Yes.
***
Q.  Do you know what services Go Daddy provided to Heiko Schoenekess in connection with account number 14152086?
A.  No.
Q.  Do you know what services Go Daddy provided to Heiko Schoenekess for account number 12996115?
A.  No.
Q.  Okay.  So can you tell me what services Go Daddy did provide to Heiko Schoenekess?
MR. LANSKY:  Object to the form.  Do you mean with respect to any domain or with respect to the disputed domain?
BY MR. CLARK:
Q.  With any domain.
A.  Without looking at the account, no.
Q.  Without looking at the account?
A.  Yeah.
Q.  And have you looked at the account?
A.  Yes.
Q.  And do you know the account number that you looked at?
A.  I don't recall.
Q.  You don't know if it's the account ending in 115?
A.  No.
Q.  Or if it's the account ending in 086?
A.  No.

***
Q.  Do you know what IRIS refers to here?
A.  It's a tool that we use to handle e-mail correspondence with customers.
Q.  So using the IRIS tool, Go Daddy's able to collect all of the e-mails they exchanged with a customer?
A.  Yes.
Q.  So you would expect to find all of the e-mails exchanged between Go Daddy and a registrant customer stored in the IRIS database?
A.  Yes.
Q.  Have you reviewed the IRIS database for Heiko Schoenekess?
A.  No.
Q.  Now, do you know if Go Daddy ever contacted Heiko Schoenekess regarding Petronas's allegations of trademark infringement?
MR. LANSKY:  Object to the form.

THE WITNESS:  No, I don't know.

BY MR. CLARK:

Q.  You don't know?

A.  No.

Q.  Okay.  If you wanted to find out, how would you go about doing that?

A.  I would contact trademark claims.

Q.  Trademark claims?

A.  At Go Daddy.

Q.  Okay.  And any particular person in trademark claims?

A.  The manager.

Q.  And who is the manager in trademark claims?

A.  Karen Newbury.

Q.  Did you speak with Karen Newbury in preparing for your deposition today?

A.  No.

Petronas requests that GoDaddy be compelled to provide witnesses who can testify fully on all of the topics designated in Petronas's Fed. R. Civ. P. 30(b)(6) notice of deposition.[2]

Documents

Petronas requests that GoDaddy be compelled to produce all documents related to Heiko Schoenekess, the registrant of the domain names at issue in this case.  The Court will recall that GoDaddy opposed Petronas's request for responses to interrogatories related to GoDaddy's documents in the letter to the Court on September 2, 2011in which counsel for GoDaddy represented that "Go Daddy has produced approximately 2400 pages of relevant documents to Petronas. . . GoDaddy is not withholding other responsive documents."  Doc. No. 107.  Despite this representation, GoDaddy has produced more than 300 pages of highly responsive documents to Petronas since that date, including more than 200 on the day after the close of fact discovery, and has indicated that it will be producing more.  It also appears that GoDaddy has failed to produce any documents related to one of the two GoDaddy accounts of Heiko Schoenekess, despite testimony by the GoDaddy deponents that such documents exist.  Accordingly, Petronas requests that GoDaddy be compelled to produce all responsive documents as soon as possible and, if necessary, make deponents available for depositions on those documents.

*Go Daddy's Position*

The parties met and conferred on October 26, 2011 and reached agreement on the issues raised above.  Go Daddy thus does not see the necessity for this section of the letter.

To date, Petronas has deposed 11 Go Daddy witnesses, many of whom were designated as Go Daddy representatives covering 30(b)(6) topics.  As Go Daddy pointed out on the meet and confer call today, Petronas has the information it seeks above.  For example, at least three

---

[2]  With respect to GoDaddy's statement below that "Petronas has deposed 11 Go Daddy witnesses," it should be noted that Petronas only took nine depositions: eight individuals and one Fed. R. Civ. P. 30(b)(6) (for which GoDaddy designated multiple deponents).  And the only reason Petronas took so many individual depositions was because GoDaddy identified all those deponents in its initial disclosures as witnesses it "may use to support its claims or defenses" pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i).

different witnesses provided estimates of the number of trademark complaints Go Daddy receives each year. Additionally, Go Daddy has produced account records containing all communications between Go Daddy and the registrant, and Petronas introduced those account records at multiple depositions. Those same account records reflect the services Go Daddy provided to the registrant. Go Daddy should not be penalized for Petronas's decision not to direct the witnesses attention to those portions of the document.

With respect to documents, over the course of the depositions Go Daddy learned of potentially responsive documents that had not yet been produced. Go Daddy proactively searched for and produced such documents prior to the discovery cutoff. Plaintiff now seeks documents relating to the registrant's second account with Go Daddy (not the account associated with the disputed domains, which has already been produced). Go Daddy has agreed to search for and produce any responsive documents associated with this second account, even though this account information is likely irrelevant to Petronas' claims, as the account is not related to the PETRONAS trademark on which this lawsuit is based.

Because Petronas has or will soon have the information it seeks, there is nothing for this Court to compel.

<u>Petronas's Document Production</u>

*Go Daddy's Position*

In the parties' joint letter to the Court dated September 2, 2011, Go Daddy stated as follows:

> Petronas' document production begs serious questions about the thoroughness and sufficiency of its collection efforts. . . .
>
> According to published reports, Petronas is a Fortune 500 company with nearly 40,000 employees. Its website boasts that Petronas is a leader in harnessing technology to advance its business. In this lawsuit Go Daddy has served on Petronas a number of document demands . . . .These 31 document demands address Petronas' U.S. sale of a wide variety of goods and services under the PETRONAS trademark (in connection with Go Daddy's counterclaim for cancellation of Petronas' trademark registration), Petronas' trademark generally, the two disputed domain names, Petronas' trademark policing efforts and Petronas' claim of damages, among other topics.
>
> Curiously, Petronas has failed to produce a single e-mail document in response. At the same time, a disproportionate number of the documents actually produced by Petronas suggest that they were merely generated by or came from the files of not Petronas, but its outside counsel: e.g., a print-out of the Lanham Act from LEXIS, the Standing Order for All Judges of the N.D. Cal. re Joint Case Management Statements, court papers from federal court actions involving other parties, print-outs from Go Daddy's website, print-outs from third-party websites and correspondence from Petronas' counsel. It seems implausible that a large,

international business such as Petronas would not have *any* e-mails or other electronic documents related to claims or defenses in a lawsuit based on the PETRONAS brand. . . .

In the Court's subsequent order dated September 6, 2011, the Court stated, in relevant part:

It is not clear what [Petronas] means by " its document production is ongoing." As the document requests were propounded on June 17, 2011, production is clearly overdue and shall be made no later than September 9, 2011.

Notwithstanding the Court's order, Petronas has failed to produce *any* internal company e-mail messages (*i.e.* emails solely between employees of Petronas and/or its subsidiaries). As Petronas's 30(b)(6) witness, Yeoh Suat Gaik, conceded at her deposition, Petronas failed to conduct electronic searches for emails or other responsive documents, nor was she aware of any searches for responsive electronic documents. *See* Exhibit A, pp. 69 - 70. It strains credulity that no such records exist. For example, Petronas has identified a subsidiary, iPerintis, charged by Petronas with monitoring third-party Internet activity, including cybersquatting, related to Petronas; it was this subsidiary that notified Petronas, apparently in writing, concerning the two disputed domain names at issue in this lawsuit. No communications from or to iPerintis, nor any agreements with iPerintis, have ever been produced (even though long ago requested). No privilege claim has been asserted with respect to iPerintis-related documents; nor could one be. More broadly, no internal Petronas e-mail messages referencing either of the two disputed domain names have been produced or identified in a privilege log.

Go Daddy is compelled to request that the Court direct Petronas (i) to confirm that no responsive, non-privileged e-mails or other electronic documents exist, or absent such confirmation, (ii) to show cause why it should not be held in violation of the Court's September 6, 2011 order.

*Petronas's Position*

GoDaddy first raised the foregoing issue on September 30, 2011 and the parties met and conferred and exchanged multiple emails on the issue until October 10, 2011, at which time Petronas thought the issue was resolved. The first time that Petronas learned that GoDaddy believed there still was an issue was at 1:30 p.m. today when GoDaddy insisted that the issue be included in this letter to the Court regarding the issues raised by Petronas above. In any event, Petronas can confirm that it is not aware of the existence of any responsive, non-privilege emails or other electronic documents in its possession to which GoDaddy refers above.

Moreover, GoDaddy's statement that "Petronas has failed to produce *any* internal company e-mail messages" is false. Petronas has provided non-privileged emails in response to GoDaddy's document requests as well as by attaching them as exhibits to pleadings in this case (and GoDaddy has included multiple copies of such emails in its document production back to Petronas).

In addition, GoDaddy's statement that "[n]o privilege claim has been asserted with respect to these documents; nor could one be," is false. Petronas served a privilege log on

September 9, 2011 asserting privilege claims for specific emails responsive to GoDaddy's document requests and GoDaddy has not identified any issues with Petronas's privilege log. GoDaddy is also incorrect when it states that "[m]ore broadly, no internal Petronas e-mail messages referencing either of the two disputed domain names have been produced or identified in a privilege log."  To the contrary, virtually every entry identified in Petronas's privilege log is an "internal Petronas e-mail message[] referencing either of the two disputed domain names."

Ms. Gaik further testified that documents related to this case from iPerentis were in the possession of the Petronas legal team handling this case.  Ex. A at 69:10-13.  Ms. Gaik explained Petronas's document collection and preservation efforts in a portion of her deposition that GoDaddy fails to cite in its section above.  Ex. B (Gaik 59:7 to 67:11).  Because this case began within three weeks of discovery of the "petronastower.net" domain name and because the Petronas legal team was in charge of the issue from the beginning, the Petronas legal team collected the documents as they were created and double-checked later in the litigation to be sure it had everything and turned it over to outside counsel.

Respectfully Submitted,

LAW OFFICES OF PERRY R. CLARK

_____/S/_____
Perry Clark
LAW OFFICES OF PERRY R. CLARK
825 San Antonio Road
Palo Alto, CA 94303
Tel.:  650 248 5817
Email: perry@perryclarklaw.com

Attorney for Plaintiff
PETROLIAM NASIONAL BERHAD (PETRONAS)

WILSON SONSINI GOODRICH & ROSATI

_____/S/_____
John L. Slafsky
David L. Lansky
Hollis Beth Hire
WILSON SONSINI GOODRICH & ROSATI

7

650 Page Mill Road
Palo Alto, CA 94304-1050
Tel. 650-493-9300
Email:  jslafsky@wsgr.com
Email:  hhire@wsgr.com

Attorneys for Defendant
GODADDY.COM, INC.

Ex. A

Page 69

1       Q.  Do you know what sort of e-mail system        11:54:43

2   Petronas uses?                                        11:54:47

3       A.  No.                                           11:54:50

4       Q.  Do you know who is responsible for            11:54:52

5   maintaining that system?                              11:54:53

6       A.  iPerintis, our IT subsidiary.                 11:54:58

7       Q.  Does iPerintis have access to all Petronas    11:55:04

8   e-mails?                                              11:55:07

9       A.  I don't know.                                 11:55:10

10      Q.  Has iPerintis been contacted with respect to  11:55:12

11  document collection and preservation in this case?    11:55:16

12      A.  I'm not sure, but I know their documents are  11:55:20

13  with us, which are relevant for this case.            11:55:26

14      Q.  Has Petronas searched for e-mails,            11:55:29

15  electronically, in connection with this case?         11:55:32

16      A.  Searched for e-mails, no, we did not.         11:55:37

17      Q.  Didn't search for e-mails.                    11:55:39

18          Okay.  Does Petronas have a document          11:55:40

19  management --                                         11:55:49

20      A.  Sorry, can I go back to the earlier           11:55:49

21  question?                                             11:55:53

22      Q.  Sure.                                          11:55:54

23      A.  When you say search for e-mails, you mean     11:55:54

24  search other people's inboxes?                        11:55:57

25      Q.  Other people's e-mail accounts.               11:55:59

Page 70

1      A.   No, I don't know.                           11:56:01

2      Q.   Does Petronas have a document management    11:56:04

3   system, an electronic document management system?   11:56:08

4      A.   Yes.                                         11:56:13

5      Q.   What system is that?                         11:56:13

6      A.   It's the same -- it's the same as what I     11:56:14

7   said just now.                                       11:56:21

8      Q.   Do you know the name of the system it uses?  11:56:25

9      A.   No.                                          11:56:28

10      Q.   Okay.  Who is responsible for maintaining   11:56:29

11   that system?                                        11:56:33

12      A.   I believe it's iPerintis.                   11:56:36

13      Q.   And are all of Petronas' electronic        11:56:40

14   documents accessible by iPerintis?                  11:56:45

15      A.   I don't know.                               11:56:51

16      Q.   Okay.  Has Petronas searched for electronic 11:56:52

17   documents that might relate to this case?           11:56:57

18      A.   I don't know.                               11:57:02

19      Q.   Do you know if Petronas -- withdraw that.   11:57:10

20           So be on notice we haven't received any     11:57:12

21   internal e-mails or electronic documents, mostly    11:57:17

22   internal e-mails relating to this case.             11:57:22

23           So we're going to reserve the right to      11:57:24

24   recall you and ask about those if subsequently we get 11:57:26

25   some of that.                                        11:57:29

Ex. B

| | |
|---|---|
| 1  documents relate to this litigation? | 11:41:58 |
| 2      A.  No. | 11:42:00 |
| 3      Q.  Okay.  That's all I have on this. | 11:42:01 |
| 4          MR. CLARK:  That was 9? | 11:42:12 |
| 5          MR. LANSKY:  Yes. | 11:42:13 |
| 6  BY MR. LANSKY: | |
| 7      Q.  Were employees at Petronas -- employees or | 11:42:20 |
| 8  anybody else at Petronas instructed to preserve | 11:42:23 |
| 9  documents in connection with this case? | 11:42:26 |
| 10     A.  Yes. | 11:42:28 |
| 11     Q.  Who was instructed to preserve documents? | 11:42:28 |
| 12     A.  Who instructed? | 11:42:34 |
| 13     Q.  Who was instructed to preserve documents? | 11:42:35 |
| 14 If it's easier to list people by department, that's | 11:42:38 |
| 15 fine, too. | 11:42:42 |
| 16     A.  Priya was instructed. | 11:42:42 |
| 17     Q.  Priya was instructed to preserve documents. | 11:42:45 |
| 18         Was anybody else instructed to preserve | 11:42:48 |
| 19 documents? | 11:42:51 |
| 20     A.  No. | 11:42:53 |
| 21     Q.  Nobody in corporate affairs was instructed | 11:42:55 |
| 22 to preserve their documents? | 11:42:57 |
| 23     A.  We have all the documents that are relevant | 11:43:00 |
| 24 to the case -- sorry, beg your pardon. | 11:43:06 |
| 25         We -- when I say "we," I mean our team, | 11:43:10 |

Page 60

1   which consists of Priya and me, have all the          11:43:13

2   documents relating to this case.                      11:43:16

3          So when we preserve it, we have the            11:43:19

4   documents for all.                                    11:43:22

5      Q.   Is it possible that people in the corporate   11:43:26

6   affairs department were communicating among          11:43:29

7   themselves regarding the disputed domains?            11:43:31

8      A.   No.                                           11:43:35

9      Q.   Why not?                                      11:43:36

10     A.   Because we are the relevant party.  We are    11:43:37

11  the focal party for this action.                      11:43:42

12         So there is no communication where we are      11:43:48

13  not involved.                                         11:43:52

14     Q.   Did anybody at Petronas ask the people in     11:43:54

15  corporate affairs if they engaged in any              11:43:59

16  communications regarding these domains that didn't    11:44:02

17  include the legal department?                         11:44:05

18     A.   We would have asked them for information and  11:44:08

19  they would have alerted us if there was any           11:44:12

20  communication.                                        11:44:17

21     Q.   So somebody actually asked them, is that      11:44:18

22  your testimony?                                       11:44:22

23     A.   In the course of the investigation and       11:44:23

24  everything, yes.                                      11:44:27

25     Q.   Okay.  How were the instructions to preserve 11:44:28

```
 1   documents communicated?                            11:44:36

 2        MR. CLARK:  Objection, it's vague.            11:44:39

 3   BY MR. LANSKY:

 4     Q.  The form.                                    11:44:41

 5        MR. CLARK:  Communicated to who?              11:44:43

 6        MR. LANSKY:  To anybody within Petronas.      11:44:47

 7        THE WITNESS:  There was instructions to       11:44:49

 8   preserve all the documents -- to print and file all 11:44:52

 9   the documents.                                     11:44:56

10   BY MR. LANSKY:

11     Q.  Was this in an e-mail or written memo or     11:44:58

12   verbally or some other form?                       11:45:01

13     A.  Verbally.                                    11:45:04

14     Q.  So not in an e-mail?                         11:45:07

15     A.  No.                                          11:45:09

16     Q.  Do you know when that instruction was given? 11:45:11

17     A.  Not exactly, but probably quite early in the 11:45:22

18   court action.                                      11:45:39

19     Q.  Sometime after the litigation was filed?     11:45:40

20     A.  Yes.                                         11:45:45

21     Q.  Do you know if it was before or after        11:45:47

22   GoDaddy served discovery requests on Petronas?     11:45:51

23     A.  It was definitely before.                    11:45:56

24     Q.  What types of documents were they instructed 11:46:03

25   to preserve?  I guess just Priya that got the      11:46:07
```

Page 62

1   instructions; is that correct?                          11:46:10

2       A.   Yes.                                           11:46:11

3       Q.   What types of documents was Priya instructed   11:46:11

4   to preserve?                                            11:46:15

5       A.   All documents -- all documents that has any    11:46:16

6   relation to this action or to any communication         11:46:21

7   before this action started.                             11:46:25

8       Q.   Did that include electronic documents?         11:46:27

9       A.   Yes.                                           11:46:29

10      Q.   Did that include internal e-mails?             11:46:31

11      A.   Yes.                                           11:46:33

12      Q.   Did that include paper documents as well?      11:46:34

13      A.   Everything.                                    11:46:38

14      Q.   Okay.  So you said there was no document        11:46:40

15  retention memo circulated; is that right?               11:46:48

16      A.   There was --                                   11:46:51

17           MR. CLARK:  Objection, lacks foundation.       11:46:54

18  BY MR. LANSKY:

19      Q.   I can rephrase it.                             11:47:00

20           Was there any formal document retention memo   11:47:01

21  circulated with respect to this litigation?            11:47:04

22      A.   There may be, but I only recall specifically   11:47:05

23  verbal communication.                                   11:47:09

24      Q.   You say may be.  How would we find out if      11:47:14

25  there was one?                                          11:47:18

1      A.   I could go through the documents because          11:47:18

2    that's all there is.                                     11:47:20

3      Q.   Okay.  Did somebody follow up with I guess        11:47:21

4    Priya to make sure the documents were being              11:47:25

5    preserved?                                               11:47:29

6      A.   I did.                                            11:47:30

7      Q.   When did you do that?                             11:47:31

8      A.   About a month ago.                                11:47:32

9      Q.   And how did you do that?                          11:47:36

10     A.   Go through all the files, to make sure that       11:47:39

11   there was complete set of documents and e-mails.         11:47:46

12     Q.   Were the files electronic that you went           11:47:54

13   through?                                                 11:47:58

14     A.   They're hard copies.                              11:47:58

15     Q.   Did you go through any electronic files?          11:48:00

16     A.   No.                                               11:48:03

17     Q.   Does Petronas have a document retention           11:48:06

18   policy?                                                  11:48:08

19     A.   Yes.                                              11:48:10

20     Q.   Is it a written policy?                           11:48:11

21     A.   Yes.                                              11:48:13

22     Q.   What is the policy?                               11:48:14

23     A.   Where is that policy?                             11:48:18

24     Q.   What is it in general, if you can tell me?        11:48:20

25     A.   Amongst other things, it has a -- it says         11:48:23

1    how long documents have to be kept, how do you        11:48:32

2    categorize documents, confidential, trade secret,     11:48:35

3    things like that.                                      11:48:38

4         Q.   Is it the same policy for electronic versus  11:48:39

5    paper documents?                                       11:48:42

6         A.   For everything.                              11:48:44

7         Q.   Was that policy suspended or modified in     11:48:45

8    light of this litigation?                              11:48:48

9         A.   No.                                          11:48:50

10        Q.   Is the policy to destroy documents after a   11:48:51

11   certain amount of time?                                11:48:56

12        A.   Yes, after seven years.                      11:48:59

13        Q.   So is everything saved for seven years?      11:49:02

14        A.   We actually don't practice that policy.  We  11:49:08

15   keep everything.                                       11:49:11

16        Q.   Forever?                                      11:49:15

17        A.   Yes.                                          11:49:16

18        Q.   Who is most knowledgeable about the document 11:49:16

19   destruction and retention policies at Petronas?        11:49:20

20        A.   Each department is -- is -- each department   11:49:26

21   is responsible for -- for complying with the policy.   11:49:31

22        Q.   Is there a person that's most knowledgeable   11:49:41

23   about the overall retention policy and how that        11:49:43

24   works?                                                  11:49:46

25        A.   Probably there is, but I'm not sure who.     11:49:51

Page 65

1    Q.   Okay.  Who managed the actual collection of    11:49:53

2    documents for this litigation?                      11:49:57

3    A.   For this litigation?                            11:50:00

4    Q.   Uh-huh.                                         11:50:02

5    A.   Priya collected and it is under my custody      11:50:03

6    now.                                                 11:50:08

7    Q.   When did the collection efforts begin?          11:50:09

8    A.   It started the time the litigation started.     11:50:13

9    Q.   So right around the time the first complaint    11:50:18

10   was filed; is that right?                            11:50:21

11   A.   Yes.                                             11:50:22

12   Q.   Who was interviewed or talked to at Petronas    11:50:25

13   regarding document collection?                       11:50:32

14   A.   It was just Priya.                               11:50:39

15   Q.   Just Priya.                                      11:50:40

16        What about the folks in corporate affairs?      11:50:42

17   A.   They're not involved.                            11:50:46

18   Q.   So Priya didn't talk to them regarding          11:50:50

19   document collection?                                  11:50:53

20   A.   She may have, but I don't know -- but it's      11:50:53

21   not likely, as I said, that we have all the documents 11:50:56

22   for the first action.                                 11:51:01

23   Q.   So did Priya talk to anybody else regarding     11:51:04

24   collection?                                           11:51:07

25   A.   Are you talking documents --                    11:51:14

Page 66

1    Q.  Collection of documents for this litigation,    11:51:17

2  did Priya go around and talk to anybody regarding    11:51:19

3  what documents they might have that relate to this    11:51:22

4  litigation?    11:51:25

5    A.  Yes, she did.    11:51:26

6    Q.  Who did she talk to?    11:51:28

7    A.  She talked to subsidiaries who have business    11:51:29

8  or trade in the United States.    11:51:40

9    Q.  Which subsidiaries are those?    11:51:41

10    A.  Those are the lubricant subsidiaries, LNG    11:51:43

11  Trading and Crude Oil Trading.    11:51:48

12    Q.  Did she talk to anybody else?    11:51:51

13    A.  She may have, but that's all I know.    11:51:54

14    Q.  Okay.  Do you know who the custodians are    11:51:58

15  for the documents that have already been produced in    11:52:01

16  this case?    11:52:03

17        MR. CLARK:  Asked and answered.    11:52:05

18        THE WITNESS:  I've already answered the    11:52:11

19  question; it's me, currently it's me.    11:52:12

20  BY MR. LANSKY:

21    Q.  But do you know where else the documents    11:52:16

22  came from, if anybody?    11:52:18

23    A.  I beg your pardon?    11:52:20

24    Q.  When I asked the document custodians, who    11:52:22

25  had the documents originally who were given to    11:52:25

| | | |
|---|---|---|
| 1 | whoever was in charge of producing things, you | 11:52:28 |
| 2 | mentioned that Priya talked to different subsidiaries | 11:52:30 |
| 3 | and maybe individuals. | 11:52:33 |
| 4 | Do you know if any of those folks actually | 11:52:35 |
| 5 | had documents they gave and were produced in this | 11:52:40 |
| 6 | litigation? | 11:52:43 |
| 7 | A.  Yes, they did produce documents. | 11:52:43 |
| 8 | Q.  Each of those subsidiaries? | 11:52:45 |
| 9 | A.  Yes. | 11:52:47 |
| 10 | Q.  Anybody else? | 11:52:48 |
| 11 | A.  No one else. | 11:52:50 |
| 12 | Q.  Are you aware that there's another | 11:52:52 |
| 13 | proceeding between GoDaddy and Petronas that's | 11:52:55 |
| 14 | pending before the U.S. Trademark Trial and Appeal | 11:52:58 |
| 15 | Board? | 11:53:02 |
| 16 | A.  Yes. | 11:53:02 |
| 17 | Q.  Okay.  And in that case, GoDaddy had | 11:53:03 |
| 18 | document requests and Petronas produced some | 11:53:06 |
| 19 | documents. | 11:53:09 |
| 20 | I'm going to call that the TTAB production; | 11:53:10 |
| 21 | is that okay? | 11:53:13 |
| 22 | A.  T ten? | 11:53:15 |
| 23 | Q.  T-T-A-B. | 11:53:17 |
| 24 | A.  Okay. | 11:53:21 |
| 25 | Q.  Are you aware that the production in that | 11:53:21 |