1   JOHN L. SLAFSKY, State Bar No. 195513
    DAVID L. LANSKY, State Bar No. 199952
2   HOLLIS BETH HIRE, State Bar No. 203651
    WILSON SONSINI GOODRICH & ROSATI
3   PROFESSIONAL CORPORATION
    650 Page Mill Road
4   Palo Alto, CA 94304
    Bus:  (650) 493-9300
5   Fax:  (650) 493-6811
    jslafsky@wsgr.com
6   dlansky@wsgr.com
    hhire@wsgr.com
7
    Attorneys for Defendant/Counterclaimant
8   GODADDY.COM, INC.

9                 UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11

12  PETROLIAM NASIONAL BERHAD,            )   CASE NO.:  09-CV-5939 PJH
                                          )
13              Plaintiff,                )   **NOTICE OF MOTION, MOTION,**
                                          )   **AND MEMORANDUM OF POINTS**
14       vs.                              )   **AND AUTHORITIES IN SUPPORT**
                                          )   **OF GO DADDY'S MOTION FOR**
15  GODADDY.COM, INC.,                    )   **SUMMARY JUDGMENT**
                                          )
16              Defendant.                )
                                          )
17                                        )
    _____)
18                                        )   Date:        December 7, 2011
    GODADDY.COM, INC.,                    )   Time:        9:00 a.m.
19                                        )   Courtroom:   3
                Counterclaimant,          )
20                                        )   Honorable Phyllis J. Hamilton
         vs.                              )
21                                        )
    PETROLIAM NASIONAL BERHAD,            )
22                                        )
                Counterclaim Defendant.   )
23  _____)

24

25

26

27

28

1
2

# TABLE OF CONTENTS

**Page**

3    TABLE OF AUTHORITIES ................................................................................................iii

4    NOTICE OF MOTION AND MOTION ............................................................................1

5    STATEMENT OF ISSUES TO BE DECIDED.................................................................1

6    MEMORANDUM OF POINTS AND AUTHORITIES ...................................................2

7    I.      INTRODUCTION...................................................................................................2

8    II.     BACKGROUND.....................................................................................................4

9            A.      THE DOMAIN NAME SYSTEM AND DOMAIN NAME
10                   REGISTRATION .......................................................................................4

11           B.      DOMAIN NAME RESOLUTION ..............................................................5

12   III.    STATEMENT OF FACTS......................................................................................7

13   IV.     ARGUMENT ........................................................................................................11

14           A.      PETRONAS HAS FAILED TO ADDUCE SUFFICIENT EVIDENCE TO
                     RAISE A TRIABLE ISSUE OF FACT ON ITS CYBERSQUATTING
                     CLAIM ......................................................................................................11

15           1.      Go Daddy Has Not "Used" the Disputed Domains as the Registrant
16                   or Registrant's Authorized Licensee ............................................11

17           2.      Go Daddy Did Not Act with a "Bad Faith Intent to Profit" from
                     Petronas's Trademark...................................................................13

18           B.      PETRONAS HAS FAILED TO ADDUCE SUFFICIENT EVIDENCE TO
19                   SUPPORT ITS CONTRIBUTORY CYBERSQUATTING CLAIM ..................16

20           1.      Petronas Has Not Established Direct Cybersquatting ..............................17

21           2.      Go Daddy Did Not Exercise "Direct Control and Monitoring" of the
22                   Alleged Cybersquatting .................................................................17

23           3.      Go Daddy Did Not Have Knowledge That the Registrant was
                     Cybersquatting .............................................................................18

24           C.      GO DADDY IS NOT LIABLE UNDER THE ACPA FOR PERFORMING
25                   BASIC REGISTRAR FUNCTIONS ....................................................20

26           D.      PETRONAS'S UNFAIR COMPETITION CLAIMS FAIL WITHOUT
                     VIABLE CYBERSQUATTING CLAIMS .........................................................22

27
28

1
2

E.      THE COURT SHOULD CANCEL PETRONAS'S TRADEMARK
REGISTRATION ...................................................................................................22

3

1.     The Registration Is Invalid Due to Abandonment ....................................23

4

2.     The Registration is Void for Exceeding the Scope of the Underlying
Registration ..............................................................................................24

5

V.     CONCLUSION ..............................................................................................................25

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*Abdul-Jabbar v. Gen. Motors Corp.*,
    85 F. 3d 407 (9th Cir. 1996)...............................................................................23

5

*Anderson v. Liberty Lobby, Inc.*,
6
    477 U.S. 242 (1986) ....................................................................................... 11

7

*Appliance Recycling Ctrs. of Am., Inc. v. JACO Envtl., Inc.*,
    No. 09-55168, 378 Fed. Appx. 652 (9th Cir. May 4, 2010)............................22

8

*Bird v Parsons*,
9
    289 F.3d 865 (6th Cir. 2002)...............................................................12, 20, 21

10

*Bosley Medical Inst., Inc. v. Kremer*,
    403 F.3d 672 (9th Cir. 2005)..........................................................................11

11

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
12
    536 F. 3d 121 (2d Cir. 2008) ..........................................................................13

13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................................................11

14

*Central Mfg., Inc. v. Brett*,
15
    492 F.3d 876 (7th Cir. 2007)..........................................................................22

16

*Cleary v. News Corp.*,
    30 F.3d 1255 (9th Cir. 1994)..........................................................................22

17

*CoStar Grp., Inc. v. LoopNet, Inc.*,
18
    373 F. 3d 544 (4th Cir. 2004)..........................................................................13

19

*D. & M. Antique Imp. Corp. v. Royal Saxe Corp.*,
    311 F. Supp. 1261 (S.D.N.Y. 1969)..........................................................22, 23

20

*Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*,
21
    84. F.3d 1143 (9th Cir. 1996)........................................................................22

22

*E&J Gallo Winery v. Spider Webs, Ltd.*,
    286 F.3d 270 (5th Cir. 2002)..........................................................................14

23

*Fare Deals, Ltd. v. World Choice Travel.com, Inc.*,
24
    180 F. Supp. 2d 678 (D. Md. 2001) ..............................................................18

25

*Ford Motor Co. v. Greatdomains.com, Inc*,
    177 F. Supp. 2d 635 (E.D. Mich. 2001) .......................................12, 16, 17, 18

26

*Georgia-Pacific Consumer Prod. LP v. Myers Supply, Inc.*,
27
    6:08-cv-6086, 2009 WL 2192721 (W.D. Ark. July 23, 2009),
       *aff'd* 621 F.3d 771 (8th Cir. 2010) ..............................................................16

28

1   *Gracie v. Gracie*,
       217 F.3d 1060 (9th Cir. 2000) ......................................................................... 22

2

3   *Imperial Tobacco Ltd. v. Philip Morris, Inc.*,
       899 F.2d 1575 (Fed Cir. 1990) ....................................................................... 23

4   *In re Lowenbrau Munchen*,
       175 U.S.P.Q. 178 (TTAB 1972) ..................................................................... 24

5

6   *Inwood Labs., Inc. v. Ives Labs., Inc.*
       456 US 844 (1982) ......................................................................................... 16

7   *Kessler v. Bishop*,
       4:08-cv-05554-PJH, 2011 WL 4635117 (N.D. Cal. Oct. 5, 2011) ................... 11

8

9   *Lockheed Martin Corp. v. Network Solutions, Inc.*,
       141 F. Supp. 2d 648 (N.D. Tex. 2001) ( "*Lockheed II*") .......................... *passim*

10  *Lockheed Martin Corp. v. Network Solutions, Inc.*,
       194 F.3d 980 (9th Cir. 1999) .................................................................. *passim*

11

12  *Lockheed Martin Corp. v. Network Solutions, Inc.*,
       985 F. Supp. 949 (C.D. Cal. 1997) .......................................................... 18, 19

13  *Lucas Nursery & Landscaping, Inc. v. Grosse*,
       359 F.3d 806 (6th Cir. 2004) ......................................................................... 19

14

15  *Marmark Ltd. v. Nutrexpa S.A.*,
       12 U.S.P.Q. 2d 1843 (T.T.A.B. 1989) ....................................................... 24, 25

16  *Oromeccanica, Inc. v. Ottmar Botzenhardt GmbH & Co., KG*,
       226 U.S.P.Q. 2d 996 (C.D. Cal. 1985) ........................................................... 24

17

18  *Sensient Tech. Corp. v. SensoryEffects Flavor Co.*,
       613 F.3d 754 (8th Cir. 2010) ......................................................................... 23

19  *Solid Host, NL v. Namecheap, Inc.*,
       652 F. Supp. 2d 1092 (C.D. Cal. 2009) .................................................. *passim*

20

21  *Southern Grouts & Mortars, Inc. v. 3M Co.*,
       575 F.3d. 1235 (11th Cir. 2009) ................................................................ 14, 15

22  *Verizon California, Inc. v. OnlineNIC, Inc.*,
       647 F. Supp. 2d 1110 (N.D. Cal. 2009) .......................................................... 20

23

24                              **STATUTES**

25  15 U.S.C. § 1064(3) ............................................................................................ 22

26  15 U.S.C. § 1119 ................................................................................................ 22

27  15 U.S.C. § 1125(d) .................................................................................. 14, 19, 20

28

15 U.S.C. § 1125(d)(1)(A) ........................................................................................ 11

15 U.S.C. § 1125(d)(1)(A)(i) ..................................................................................... 13

15 U.S.C. § 1125(d)(1)(B)(ii) .................................................................................... 14

15 U.S.C. §1125(d)(1)(D) ......................................................................................... 12

15 U.S.C. § 1126(e) ................................................................................................... 24

15 U.S.C. § 1127 ................................................................................................. 23, 24

Calif. Bus. & Prof. Code § 17200 ............................................................................. 22

## RULES

37 C.F.R. § 2.32(a)(6) ............................................................................................... 24

37 C.F.R. § 2.56(b)(1) ......................................................................................... 23, 24

Fed. R. Civ. P. 56(e) ................................................................................................. 11

Fed. R. Civ. P. 56 ............................................................................................. *passim*

TMEP § 904.03(g) (8th ed. Oct. 2011) ..................................................................... 24

TMEP § 1009 ............................................................................................................ 24

TMEP § 1012 ............................................................................................................ 24

## MISCELLANEOUS

4 McCarthy on Trademarks and Unfair Competition § 25:73.40 (4th ed. 2010) ......................... 20

4 McCarthy on Trademarks and Unfair Competition § 29:12 (4th ed. 2010) .............................. 24

H.R. Rep. No. 105-551 (I) (1998) ........................................................................ 13

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 7, 2011, 2011, at 9:00 a.m. in the courtroom of the Hon. Phyllis J. Hamilton, Courtroom 3, United States District Court, Northern District of California, 1301 Clay Street, Oakland, California, Defendant/Counterclaimant Go Daddy.com, Inc. ("Go Daddy") will and hereby does move pursuant to Federal Rule of Civil Procedure 56 for summary judgment in its favor on all claims asserted by, and against, the Plaintiff/Counterclaim Defendant Petroliam Nasional Berhad ("Petronas") in this action.  The motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the attached declarations, and exhibits thereto, the pleadings and papers on file in this action, and any other submissions or arguments of counsel as may be presented to the Court.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Is Go Daddy entitled to summary judgment dismissing Petronas's Anticybersquatting Consumer Protection Act ("ACPA") claim because there is no evidence that Go Daddy registered, trafficked in, or used the disputed domains with a bad faith intent to profit from Petronas's trademark?

2.      Is Go Daddy entitled to summary judgment dismissing Petronas's Contributory Cybersquatting claim because (a) there is no finding of any cybersquatting to which Go Daddy could contribute, (b) there is no evidence that Go Daddy controlled the cybersquatting conduct; and (c) there is no evidence that Go Daddy had the requisite knowledge of underlying cybersquatting?

3.      Is Go Daddy immune from direct or contributory liability under the ACPA because it merely performed the basic functions of a registrar?

4.      Is Go Daddy entitled to summary judgment dismissing Petronas's Unfair Competition claim because there is no basis for the underlying cybersquatting claims and no evidence supporting the claim?

5.      Is Go Daddy entitled to summary judgment granting its counterclaim for cancellation of Petronas's federal trademark registration due to abandonment and/or invalidity?

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.     INTRODUCTION**

3             Petronas has aggressively over-litigated for two years a cybersquatting case against the

4    wrong party.  Petronas has taken this wasteful litigation to summary judgment despite these facts:

5    it already possesses the two disputed domains, and has controlled them for over a year; the identity

6    of the alleged cybersquatter has been publicly available for years, and could have been uncovered

7    with one simple Internet search; Petronas could have secured the two domain names within about

8    60 days (by February 2010) by using the commonly accepted administrative proceeding for

9    recovering domain names in situations like this; Petronas is not aware of any customers or others

10   ever learning of the domain names; and the law clearly shields Go Daddy, a domain name

11   registrar, from liability for the actions of third parties alleged here.

12            This case concerns someone else's registration of two domain names –

13   <petronastower.net> and <petronastowers.net> (the "Disputed Domains") – that Petronas claims

14   incorporate its trademark.  As set forth in detail below, an individual registered the Disputed

15   Domains in 2003 with a registrar other than Go Daddy and pointed, or "forwarded," the domains

16   to a pre-existing website featuring pornography.  Four years later, in 2007, the individual

17   transferred the Disputed Domains to a new registrar, Go Daddy, and pointed them to the same

18   pornographic website using Go Daddy's automated online "dashboard" for domain name

19   registrants.

20            More than two years later – six years after the Disputed Domains were first registered –

21   Petronas identified one of the Disputed Domains and asked Go Daddy to take action.  Go Daddy

22   responded immediately, pursuant to its standard policies and practices, notifying Petronas that Go

23   Daddy was not the host of the pornography and calling Petronas's attention to the Uniform

24   Domain Name Dispute Resolution Policy ("UDRP"), which all registrars are required to follow

25   and which sets forth an expedited and inexpensive arbitration process for domain name disputes.

26   Go Daddy explained that it cannot and does not intervene in such disputes and stated that it

27   required a court or arbitral order to comply with Petronas's demands to disable the domain name.

28

1   Petronas, however, did not initiate a UDRP administrative proceeding, did not take action

2   against the registrant of the Disputed Domains and did not even contact the host of the

3   pornographic website.  Instead, Petronas sued Go Daddy, seeking to hold the domain name

4   registrar responsible.  Then, even after securing the Disputed Domains, Petronas continued to

5   litigate this action, burdening Go Daddy with two years of extensive document discovery, 12

6   depositions and repeated motion practice.  Yet today, even after considerable litigation, Petronas's

7   claims against Go Daddy remain meritless.

8   In particular, Petronas's cybersquatting claims fail because there is no evidence that Go

9   Daddy registered, trafficked in, or used the Disputed Domains.  Petronas's argument that Go

10  Daddy somehow "used" the Disputed Domains by automatically forwarding them at the initiative

11  of its registrant-customer defies common sense and is unsupported by law or fact.

12  Petronas's cybersquatting claims also fail because there is no evidence suggesting that Go

13  Daddy had the requisite bad faith intent to profit from Petronas's trademark.  There is no dispute

14  that Go Daddy's systems involved with registration and routing of the Disputed Domains were

15  automated, and Go Daddy had no more knowledge of the activities related to these domain names

16  than it does for any other of the over 50 million domain names under its management.  When

17  Petronas did make a trademark claim with Go Daddy, Go Daddy responded promptly, in the

18  manner it understood was required by the UDRP and consistent with industry practice: stating that

19  registrars cannot and should not insert themselves into disputes between trademark owners and

20  domain name registrants over the use of particular domain names.

21  As to Petronas's claim for contributory cybersquatting, it also fails because there is no

22  finding of underlying cybersquatting, there is no evidence that Go Daddy controlled and monitored

23  the cybersquatting conduct, and there is no evidence of the "exceptional circumstances" required

24  to hold a third party liable.

25  Furthermore, Petronas's cybersquatting and contributory cybersquatting claims fail because

26  there is no genuine issue of fact that domain name forwarding, *i.e.*, pointing a domain name to a

27  pre-existing website, is one of the protected routing functions of registrars.

28

1    Nor can Go Daddy be subject to liability for unfair competition where, as here, the

2    underlying cybersquatting claims fail.

3    Go Daddy's counterclaim for cancellation of Petronas's federal trademark registration

4    should also be granted.  Though Petronas has had ample opportunity to produce the required

5    evidence of use of the mark in commerce in the United States, it has failed to do so.  The

6    registration is defective for this and other reasons detailed below.

7    **II.    BACKGROUND**

8    Petronas is an oil and gas company with headquarters in Kuala Lumpur, Malaysia.  FAC,

9    ¶¶ 1, 7.[1]  Go Daddy is the world's largest domain name registrar, with over 50 million domain

10   names registered by customers around the world.  Hanyen, ¶ 2.  This action concerns two domain

11   names – <petronastower.net> and <petronastowers.net> – that were allegedly used by one or

12   more non-parties to violate Petronas's trademark rights by cybersquatting.  *See* FAC. ¶ 14.

13   Petronas seeks to hold Go Daddy, the registrar of the Disputed Domains, liable for

14   cybersquatting merely because the non-party registrant utilized Go Daddy's automated systems

15   to point the domain names to a pornographic website hosted elsewhere.  *Id.* ¶¶ 63-65.

16   **A.    THE DOMAIN NAME SYSTEM AND DOMAIN NAME REGISTRATION**

17   The Internet is a network of interconnected computers and computer networks.  Every

18   computer connected to the Internet has a numerical address known as an "Internet Protocol

19   Address" or "IP Address," required for one computer to communicate with another.  Palage, ¶¶

20   32-34.  Few people access websites by typing the IP Address.  *See id.* ¶ 35.  Instead, an Internet

21   user simply types an alpha-numeric "domain name" that represents the IP Address into his/her

22   web browser.  *See id.*  In response to the entry of a domain name, the user's computer

23   communicates back and forth with the Domain Name System ("DNS"), a set of servers that

24   allow the user to locate the IP Address for the computer that hosts the desired website.  *See id.* ¶¶

25   32-37.  The DNS does not provide any website content.  *See id.* ¶ 37.  Rather, it functions as the

26

27   [1] Citations to the First Amended Complaint will be in the form "FAC, ¶ _."  Citations to
     declaration paragraphs or exhibits will be in the form "[Declarant], [¶ or Ex.] __."  Citations to
28   deposition testimony will be in the form "[Witness], at __."

1   Internet's equivalent of "directory assistance."  *See id.* The fundamental building block of the

2   DNS is the "nameserver," which is a database of IP Addresses.  *See id.* ¶¶ 35-37.

3        The DNS functions properly because the process for acquiring a domain name is

4   extremely orderly.  The rights to domain names are sold to the public in a process known as

5   "domain name registration."  *See id.* ¶¶ 28-30, 38-40.  Yet domain name "registries," the entities

6   responsible for maintaining the authoritative, master list of all domain names, do not deal

7   directly with the general public.  *See id.* ¶¶ 27-29.  Rather, a person who registers a domain name

8   does so through a domain name "registrar" such as Go Daddy.  *See id.* ¶¶ 29, 38.  The registrar is

9   the designated intermediary between the domain name registrant and the domain name registry.

10  *See id.* ¶¶ 27, 29.[2]  A registrant chooses a registrar to provide the registration services, and that

11  registrar becomes the designated registrar for the selected domain name.  *See id.* ¶¶ 30, 38.  Only

12  the designated registrar may modify or delete information about domain names in a central

13  registry database.  *See id.* ¶¶ 29, 43.  After registering the domain name, the registrant uses an

14  online dashboard provided by the registrar to designate the nameserver information concerning

15  where the website is hosted.  *See id.* ¶¶ 47, 49-52.  The registrar's participation in this process is

16  entirely automated.  *See id.* ¶¶ 48-49; *see also* Roling, ¶¶ 4-8.

17        **B.    DOMAIN NAME RESOLUTION**

18        "Domain name resolution" is the process whereby the DNS converts a domain name into

19  an IP Address that points to a computer hosting a website.  *See* Palage, ¶ 45; *see also* Roling, ¶ 4.

20  Resolution is a multi-step process involving a series of lookups ("resolutions") on various servers.

21  *See* Palage, Ex. 1 at 28-29.

22        In order for the user's browser to determine which computer on the Internet to access, the

23  browser performs a domain name lookup and translates that domain name into a unique IP

24  Address.  *See id.*  In the first instance, this resolution request is sent locally to the DNS resolver

25  that is part of the user's local operating system (*e.g.*, Windows, Mac OS, etc.).  *See id.*  In

26

27        [2] Go Daddy and all other registrars are accredited by the Internet Corporation for Assigned
    Names and Numbers ("ICANN").  *See* Palage, ¶¶ 24, 29.

28

general, it will next query the local nameserver of the user's Internet Service Provider ("ISP") (*e.g.*, AT&T, Comcast, etc.).  *See id.*, Ex.1 at 28.  It will initiate a series of queries to the DNS databases, eventually resulting in the authoritative domain nameserver returning the IP Address of the computer hosting the sought Internet content.  *See id.*, Ex.1 at 28-29.  The ISP local nameserver then returns this information to the user's DNS resolver, thereby allowing the user's computer to access the Internet content.  *See id.*, Ex.1 at 29.  This resolution process, by which the user obtains the IP address of the computer hosting the desired Internet content from the authoritative domain nameserver, is commonly referred to as "routing."  *See id.* ¶ 41.  Registrars like Go Daddy play a critical role in the process by giving the registrant an efficient means to configure the nameserver to point the user to the desired Internet content.  *See id.* ¶ 53.  If registrars stopped performing the function of taking name server information and providing it to registries, the Internet would grind to a halt.  Roling, ¶ 3.

Using the registrar's dashboard, the registrant can choose from several options to point his domain name to content.  First, the registrant can do nothing, in which case the nameserver might route to a "coming soon" page or to a page with other default information.  Palage, ¶ 44.  Second, the registrant can configure the nameserver so that it routes to a "record not found" error message.  *Id.*  Third, the registrant can configure the nameserver so that it routes to a newly created website on a server hosted by the registrar or some third party.  *Id.*  Fourth, the registrant can configure the nameserver to route to an existing website already associated with another domain name.  *Id.*  This last form of routing is referred to as "domain name forwarding."  *See id.* ¶ 48.  When a registrant elects to route his domain name in this fashion, an Internet user typing the forwarded domain name into his web browser will be automatically directed to the pre-existing website.  From the Internet user's perspective, there is no difference between forwarding and other forms of routing.  *See id.*[3]

---

[3] Petronas itself uses domain name forwarding and thus is familiar with the process.  FAC, ¶ 12.

1    Forwarding is a ubiquitous routing service that has been provided by Go Daddy and

2  virtually all registrars for more than a decade.  *See id*. ¶¶ 13, 49.  Go Daddy provides forwarding

3  services for 8.2 million domain names under its management, and has provided such service in

4  combination with its other domain name routing services since 2002 or before.  Roling, ¶ 13.  Go

5  Daddy does not charge customers for domain forwarding, but rather offers this routing option as

6  part of its registration services.  *See id.* ¶ 2.  Go Daddy's registration customers, using Go

7  Daddy's dashboard, can configure the nameserver to forward a domain name to an existing

8  website.  *See* Palage, ¶ 50; Roling, ¶¶ 6-8.  This automated process is accomplished without any

9  interaction between the registrant and Go Daddy personnel.  *See* Roling, ¶¶ 6-8.

10  **III.    STATEMENT OF FACTS**

11    The Disputed Domains were initially registered by a third party through a different

12  registrar, eNom, on May 8, 2003.[4]  *See* Slafsky, Exs. 3-4.  By May 29, 2004, both Disputed

13  Domains pointed to an IP Address associated with a pornographic website.  *See id.* ¶ 6 & Exs. 1-

14  5.  For most of the time between May 29, 2004 and November 11, 2006, at least one of the

15  Disputed Domains was directed to a website displaying pornography.  *Id.*  On April 1, 2007,

16  nearly four years after the Disputed Domains were initially registered, the then-registrant –

17  Heiko Schoenekess – changed registrars from eNom to Go Daddy.  *See id*. Exs. 3-4; Hanyen, ¶

18  18 & Ex.7 at pp. 367, 369.  Schoenekess used Go Daddy's online dashboard to automatically

19  forward the Internet traffic for the Disputed Domains to the same pornographic website they had

20  been associated with in years past.  Roling, ¶ 15 & Ex. 4; Slafsky, ¶ 6 & Exs. 1-5.

21    Years later, the <petronastower.net> domain was discovered by iPerintis, a subsidiary of

22  Petronas tasked with searching for potential trademark infringement.  Slafsky, Ex. 9 (Gaik, 31:4-

23  32:10).  On November 26, 2009, iPerintis contacted Go Daddy to request that Go Daddy "take

24  action against the website associated with the 'petronastower.net' domain name." FAC, ¶ 45.  Go

25  Daddy responded on November 30, stating that it would not tolerate illegal content on its

26

27
───────────────
    [4] For the Court's convenience, a summary timeline of the key dates related to the Disputed
28  Domains can be found at Slafsky, Ex. 6.

customers' websites and would cooperate with law enforcement to get any such websites taken down.  Hanyen, Ex. 8.  Go Daddy further informed Petronas that:

> any disputes over the ownership or wording of the domain name itself will need to be sent to either the registrant, through an arbitration forum such as World Intellectual Property Organization ... or the local court system.  Per ICANN regulations, domain registrars are prohibited from becoming involved in domain ownership disputes.

*Id.*  Petronas did not proceed as Go Daddy suggested.[5]  Instead of utilizing an arbitration procedure, which Petronas had successfully used four times previously, *id.* ¶ 70, Petronas sought to inject Go Daddy into its dispute with the registrant.

On December 16, 2009 counsel for Petronas submitted a trademark claim to Go Daddy.  Hanyen, Ex. 9.  Counsel attached Go Daddy's "Trademark and/or Copyright Infringement Policy," which states:

> **Domain Name Dispute Claims**
>
> Please refer to the Uniform Domain Name Dispute Resolution Policy ("the UDRP") if you have a concern or dispute concerning a domain name. The UDRP covers domain name disputes; this policy specifically excludes domain name disputes.

*Id.*  Go Daddy responded the same day, informing Petronas that:

> [a]lthough the domain PETRONASTOWER.NET is registered through our company, the domain is forwarding to a website that is hosted elsewhere.  Any issues regarding the content of the website will need to be addressed to the owner of the site, either directly, or to the hosting provider.

*Id.,* Ex. 10.  Further, consistent with its stated policy, Go Daddy reiterated:

> We can only process claims of trademark infringement against the content of websites that we host.  ICANN, the managing body of the internet, domain name registrars, specifically prohibits domain registrars from becoming involved in disputes over domain ownership in their <u>Uniform Domain Name Dispute Resolution Policy</u>.  Any disputes over the ownership or wording of the domain name itself will need to be sent either to the owner, or through an arbitration forum, or the local court system.

---

[5]  Had Petronas initiated the suggested arbitration proceeding at that time, it likely would have obtained ownership of the Disputed Domain within approximately 60 days.  Palage, ¶ 82.

1    *Id.*  Indeed, the UDRP governs the relationship between the registrar and its customers and is

2    incorporated into all domain registration agreements.  *Id.*, Ex. 4; Palage, ¶ 64.  As an ICANN-

3    accredited registrar, Go Daddy is required to implement and follow the UDRP for disputes

4    concerning domain names.  *See* Palage, ¶ 64; Slafsky, Ex. 11 (Hanyen (10/20/2011), 6:17-7:17,

5    36:2-11), *id.,* Ex. 10 (Hanyen (10/12/2011), 7:6-17, 33:16-34:3).  That policy requires registrars,

6    other than in exceptional circumstances, to maintain the status quo during a domain name dispute

7    until receipt of directions from the registrant, an order from a court or arbitral tribunal, or the

8    decision of an administrative panel.  Hanyen, Ex. 4 (UDRP), ¶¶ 3, 7; Slafsky, Ex. 12 (Bilunes,

9    9:1-19); *id.* Ex. 11 (Hanyen (10/20/2011), 16:3-17).  (Domain name disputes involving the right

10   to use a trademark in a domain name are not exceptional circumstances under the UDRP.  *See*

11   Palage, ¶ 81).  Additionally, as Go Daddy informed Petronas, the UDRP specifically prohibits

12   registrars from becoming involved in disputes over domain name ownership.  Hanyen, Ex. 4

13   (UDRP), ¶¶ 3, 7.

14        On December 18, 2009, Petronas initiated this lawsuit by filing a complaint and a motion

15   for a temporary restraining order.  Go Daddy, in accordance with its standard operating

16   procedures and the requirements of the UDRP, locked the domain name.  Slafsky, Ex. 13 (Ede,

17   14:4-17); *id.,* Ex. 12 (Bilunes, 12:25-13:7); *id.,* Ex. 11 (Hanyen (10/20/2011), 16:3-17, 23:9-21).

18   This Court denied the TRO motion.  *See* Dkt. No. 21.

19        On January 29, 2010, Petronas initiated a Lanham Act *in rem* proceeding in this Court

20   against the domain name <petronastower.net>.  *See* Case No. 4:10-cv-00431-PJH.  Petronas

21   obtained an Order for the transfer of <petronastower.net> and Go Daddy completed the transfer

22   to Petronas's counsel on May 18, 2010.  Hanyen, ¶ 24.

23        Petronas discovered a second allegedly infringing domain name - <petronastowers.net> -

24   in July 2010.  Just as before, counsel for Petronas submitted a trademark claim to Go Daddy and

25   included a copy of Go Daddy's policy stating that domain name disputes were governed by the

26   UDRP.  *Id.*, Ex. 11.  Again, Go Daddy responded that, because the website was hosted

27   elsewhere, issues regarding the content of the website had to be addressed with the owner of the

28   website or the hosting provider.  *Id.*, Ex. 12; Hanyen (10/20/2011), 25:3-14.  Go Daddy

1   reiterated that it was prohibited by ICANN and the UDRP from getting involved in such

2   disputes.  Hanyen, Ex. 12.

3          On July 12, 2010, Petronas initiated an *in rem* proceeding in this Court, this time against

4   the domain name <petronastowers.net>.  *See* Case No. 4:10-cv-03052-PJH.  This second *in rem*

5   action – Petronas's third lawsuit in this matter – resulted in the transfer of the domain name to

6   Petronas on August 30, 2010.  *See* Hanyen, ¶ 27.

7          On September 9, 2010 this Court granted Go Daddy's motion for judgment on the

8   pleadings, dismissing all claims.  Dkt. No. 67.  It held that Petronas failed to plead facts

9   "sufficient to show that GoDaddy 'used' the domain name, or that it registered or maintained the

10  domain name with a 'bad faith intent to profit' from the registration or maintenance of the

11  'Petronas' mark."  *Id.* at p. 4.  Additionally, this Court held that if Go Daddy's forwarding

12  service was "substantially similar to the 'routing' service offered by NSI in *Lockheed . . .*

13  [Petronas's] cybersquatting claims will likely fail."  *Id.*  Despite already possessing the Disputed

14  Domains, Petronas refused to let go of the lawsuit, and instead filed the FAC.  *See* Dkt. No. 69.

15  Go Daddy moved to dismiss, but the Court held that it was:

16          unable to resolve a number of the issues raised in the present motion in the
            absence of a developed record.  Among other things, the court requires a record
17          clarifying the mechanics of what GoDaddy did or does with regard to the disputed
            domain names, and what "forwarding" and "routing" are and whether either or
18          both can be considered part of domain name registration services generally or the
            services offered by GoDaddy.

19

20  Dkt. No. 87.

21         On May 19, 2011, Go Daddy filed its Answer to the FAC (s*ee* Dkt. No. 89) and on July 28,

22  2011 filed its Amended Answer and Counterclaim.  *See* Dkt. No. 106.  Go Daddy's Counterclaim

23  seeks cancellation of United States Trademark Registration No. 2,969,707 for the mark

24  PETRONAS AND DESIGN.  *See* Dkt. No. 106 at pp. 12-14.

25         Fact discovery in this action closed on October 19, 2011.  Expert discovery is to close on

26  November 19, 2011.

27

28

## IV.   ARGUMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  "Material facts are those that might affect the outcome of the case."  *Kessler v. Bishop*, 4:08-cv-05554-PJH, 2011 WL 4635117, at *7 (N.D. Cal. Oct. 5, 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute as to a material fact is not "genuine" unless "there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party." *Id.*  A party seeking summary judgment "bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  On any issue where the nonmoving party will bear the burden of proof at trial, "the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 324–25).  Where, as here, the moving party meets its initial burden, the opposing party must set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See id.* (citing Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250).

### A.   PETRONAS HAS FAILED TO ADDUCE SUFFICIENT EVIDENCE TO RAISE A TRIABLE ISSUE OF FACT ON ITS CYBERSQUATTING CLAIM

In order to prevail on its ACPA claim, Petronas must establish that (1) Go Daddy registered, trafficked in, or used the Disputed Domains; (2) the Disputed Domains are identical or confusingly similar to Petronas's distinctive or famous trademark; *and* (3) Go Daddy's actions were undertaken with a bad faith intent to profit from Petronas's mark.  15 U.S.C. §1125(d)(1)(A); *see also Bosley Medical Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005).  There is insufficient evidence for a reasonable juror to find for Petronas on elements (1) or (3).

### 1.   Go Daddy Has Not "Used" the Disputed Domains as the Registrant or Registrant's Authorized Licensee

Petronas seeks to hold Go Daddy liable under the ACPA for allegedly "using" the Disputed Domains to route Internet users via Go Daddy nameservers to a third-party website, *see* FAC,

¶ 63,[6] but this is not a "use" prohibited by the statute.  Rather, only the domain name registrant or the registrant's authorized licensee can "use" a domain name for purposes of the ACPA.  15 U.S.C. §1125(d)(1)(D); *see also, Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001) ("*Lockheed II*") ("Section 1125(d)(1)(D) expressly limits the 'uses' feature to the domain name registrant or the registrant's authorized licensee").

The undisputed evidence establishes that Heiko Schoenkeness, not Go Daddy, was the registrant of the Disputed Domains.  *See* FAC, ¶¶ 41, 53; *see also* Hanyen, Exs. 9, 11.  Accordingly, Go Daddy can only be liable if it is an "authorized licensee" of the registrant.  But there is not a shred of evidence to support a finding that Go Daddy acted as the registrant's authorized licensee.  There is no contract between the registrant and Go Daddy that grants Go Daddy a license to use the Disputed Domains.  There also is no evidence of communication between Go Daddy and the registrant in which the registrant might have granted Go Daddy a license to use the Disputed Domains.  Thus, there is no genuine issue of material fact that Go Daddy was not acting as the authorized licensee of the registrant, and Go Daddy is entitled to summary judgment on the ACPA claim.  *See Bird v. Parsons*, 289 F.3d 865, 881 (6th Cir. 2002) (plaintiff failed to state an ACPA claim based on "use" of a domain name because there was no allegation that defendant was the registrant's authorized licensee).

Moreover, Go Daddy's conduct is not the type of "use" that is covered by the ACPA.  Go Daddy neither created the website to which the Disputed Domains pointed, nor placed any content on such website, and it has never been associated with that website. FAC, ¶¶ 49, 54.  The ACPA is directed at illegitimate uses of a domain name intended to simply profit from the value of a trademark.  *See  Ford Motor Co. v. Greatdomains.com, Inc*, 177 F. Supp. 2d 635, at 642, 645 (E.D. Mich. 2001). Go Daddy, as a registrar, merely provided the infrastructure for the registrant to route the Disputed Domains automatically to the website of his choosing.  *See* FAC, ¶ 44.  This is not the type of illegitimate use addressed by the statute.

---

[6] Petronas does not seek to hold Go Daddy liable for "registering" or "trafficking" in the Disputed Domains.

1

2

**2.    Go Daddy Did Not Act with a "Bad Faith Intent to Profit" from Petronas's Trademark**

3        Although "bad faith" is an element considered in other causes of action, it has a highly

4  specific meaning in the context of the ACPA.  "The bad faith required to support a cybersquatting

5  claim is not general bad faith, but a 'bad faith intent to profit *from the mark*.'"  *Solid Host, NL v.*

6  *Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1109 (C.D. Cal. 2009) (quoting 15 U.S.C.

7  § 1125(d)(1)(A)(i)).  (emphasis in original)  Where, as here, there is a lack of evidence that the

8  defendant had a bad faith intent to profit from the plaintiff's specific trademarks, summary

9  judgment should be granted.  *Lockheed II*, 141 F. Supp. 2d at 654 (granting summary judgment

10 due to lack of evidence that defendant had bad faith intent to profit from plaintiff's specific marks).

11       First, there is no evidence of any bad faith intent by Go Daddy.  With respect to Go

12 Daddy's initial conduct in forwarding the Disputed Domains to a third-party website, the

13 undisputed evidence demonstrates that Go Daddy had no intent because, *inter alia*, it engaged in

14 no volitional conduct.  Go Daddy's dashboard is an automated system.  Roling, ¶¶ 4-8.  This

15 system allows the registrant to set the nameservers and otherwise determine where to route the

16 domain name.  Munson, ¶ 7.  In this case, the registrant of the Disputed Domains utilized the

17 system to cause Internet users who typed the Disputed Domains into their browser to be routed to

18 an existing website hosted by a third party.  *See* Roling, ¶¶ 15-16; Munson, *id*. ¶ 8.  Absent any

19 volitional conduct, Go Daddy itself cannot be found liable under a statute that requires intentional

20 conduct, a conclusion that is well-established in the copyright context.  *See, e.g., Cartoon Network*

21 *LP v. CSC Holdings, Inc.,* 536 F. 3d 121, 131–32 (2d Cir. 2008) (person who uses automated

22 system supplies requisite volitional conduct, not provider of system); *CoStar Grp., Inc. v. LoopNet,*

23 *Inc.,* 373 F.3d 544, 551 (4th Cir. 2004) (volitional conduct required for infringement claim not

24 satisfied by providing automated system that responds indiscriminately to user requests); H.R.

25 Rep. No. 105-551 (I) at 11 (1998) ("As to direct [copyright] infringement, liability is ruled out for

26 passive, automatic acts engaged in through a technological process initiated by another.").

27 Notably, courts interpreting the ACPA have informed their decisions based on interpretations of

28

1  the Copyright Act. *See, e.g., E&J Gallo Winery v. Spider Webs, Ltd.,* 286 F.3d 270 (5th Cir.

2  2002).

3       There also is no evidence of bad faith intent arising from Go Daddy's maintenance of the

4  Disputed Domains after being notified by Petronas of its alleged trademark rights. The nine non-

5  exclusive statutory factors that courts may consider when evaluating whether the defendant acted

6  with bad faith intent, *see* 15 U.S.C. § 1125(d), are generally inapplicable to registrars. *See, e.g.,*

7  *Lockheed II* at 655 ("[N]one of the conditions and conduct listed [in the nine factors] would be

8  applicable to a person functioning solely as a registrar or registry of domain names"). However,

9  following the list of factors, the ACPA contains a catch-all provision that is directly on point:

10  "Bad faith intent described under subparagraph (A) shall not be found in any case in which the

11  court determines that the person believed and had reasonable grounds to believe that the use of

12  the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

13       Here, the undisputed evidence establishes that Go Daddy's intent in maintaining the

14  Disputed Domains following notice of Petronas's trademark claims until receipt of a transfer

15  order was to comply with Go Daddy's standard operating procedures and to implement the

16  UDRP. Slafsky, Ex. 11 (Hanyen (10/20/2011), 29:24-30:5).[7]  Go Daddy drafted its standard

17  operating procedures in order to comply with the UDRP, to which it is bound under its

18  accreditation agreement with ICANN.[8]  Go Daddy took no action on Petronas's trademark

19  claims other than (i) providing Petronas with information to assist it in seeking a transfer order,

20  and (ii) locking each domain upon notice of the commencement of a legal proceeding until

21  receipt of a transfer order, because that is what it understood was required by the UDRP for such

22  domain name disputes.

23       Second, there is no evidence that Go Daddy acted with an intent to profit. As explained by

24  the Eleventh Circuit, "[p]roving 'bad faith' is not enough. A defendant is liable only where a

---

[7] *See also* Slafsky, Ex. 11 (Hanyen (10/20/2011), 16:3-17, 36:2-11); *id.,* Ex. 10 (Hanyen (10/12/2011), 7:6-17, 33:16-34:3); *id.,* Ex. 12 (Bilunes, 9:1-19; 12:25-13:7, 15:22-16:7).

[8] *See, e.g.,* Slafsky, Ex. 12 (Bilunes, 9:1-19); *id.,* Ex. 11 (Hanyen (10/20/2011), 29:24-30:5); 36:2-11; *id.,* Ex. 10 (Hanyen (10/12/2011), 7:6-17; 33:16-34:3); *see also* Palage, ¶ 62.

1    plaintiff can establish that the defendant had a 'bad faith *intent to profit*." *Southern Grouts &*

2    *Mortars, Inc. v. 3M Co.*, 575 F.3d. 1235, 1246 (11th Cir. 2009).  Here, Go Daddy does not charge

3    registrants for utilizing domain forwarding as a means of routing their domain names.  Slafsky, Ex.

4    14 (Hertz, 14:15-17); FAC, ¶ 69.  Additionally, there is no evidence that Go Daddy otherwise

5    profited, or intended to profit, from the registrant's use of the forwarding service to route the

6    Disputed Domains to a website hosted by a third party, or from maintaining that routing pending

7    resolution of the domain name dispute in accordance with Go Daddy's policies and standard

8    operating procedures.

9            Third, there is no evidence that Go Daddy acted with an intent to profit from Petronas's

10   specific trademark, as required to establish an ACPA claim.  *See, e.g., Solid Host*, 652 F. Supp. 2d

11   at 1110 (finding inadequate allegations of intent to profit from specific mark where "[t]he only

12   intent to profit alleged is linked to [defendant's] operation and promotion of its anonymity

13   service"); *Lockheed II*, 141 F. Supp. 2d at 654-55 (granting summary judgment on ACPA claim

14   where no evidence defendant acted with bad faith intent to profit from "specific marks.").  The

15   record reflects that the registrant of the Disputed Domains, in transferring the registrations to Go

16   Daddy, represented that "each registration [he made was] being done so in good faith and that [he

17   had] no knowledge of it infringing upon or conflicting with the legal rights of a third party or a

18   third party's registration, trademark or trade name.  [He] also warrant[ed] that the domain name[s]

19   being registered [would] not be used in connection with any illegal activity."  *See* Jett, ¶ 3 & Ex. 3

20   at 7.  Thus there was no basis for Go Daddy to believe there might be any unlawful conduct at the

21   time the registrations were transferred to Go Daddy.  Even after Go Daddy received Petronas's

22   trademark claims, there is no evidence that Go Daddy maintained the Disputed Domains with the

23   intent to profit from Petronas's marks.  Rather, the evidence reflects that Go Daddy followed its

24   standard policies and procedures and treated Petronas's claim the same as it would treat any other

25   such claim.

26

27

28

**B.     PETRONAS HAS FAILED TO ADDUCE SUFFICIENT EVIDENCE TO SUPPORT ITS CONTRIBUTORY CYBERSQUATTING CLAIM**

There is no contributory cybersquatting claim set forth in the ACPA statute.  Contributory liability for trademark infringement has been found where a manufacturer or distributor either (1) intentionally induces another to infringe a trademark, or (2) continues to supply its product with actual or constructive knowledge that the product is being used to engage in trademark infringement.  *Inwood Labs., Inc. v. Ives Labs., Inc.* 456 US 844, 855 (1982).  Where, as in the case of a domain name registrar, the defendant provides a service rather than a product, the "supplies a product" element is replaced by a showing that the defendant exercised "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999); *see Solid Host*, 652 F. Supp. 2d at 1112 (under extent of control theory plaintiff must prove defendants had knowledge and direct control and monitoring of instrumentality used to infringe).  In all such cases, there must first be proof of direct infringement in order to find another liable for contributory infringement.  *See, e.g., Georgia-Pacific Consumer Prod. LP v. Myers Supply, Inc.*, 6:08-cv-6086, 2009 WL 2192721, *4 (W.D. Ark. July 23, 2009) ("[t]he second element of contributory infringement is actual infringement"), *aff'd* 621 F.3d 771, 774 (8th Cir. 2010) (upholding summary judgment of no contributory infringement where underlying behavior did not constitute direct infringement).

While it is not clear that a claim for contributory cybersquatting even exists, two district courts have assumed that it does, and have analyzed such claims under the *Lockheed* rubric.[9]  *See Solid Host*, 652 F. Supp. 2d at 1111-13; *Ford*, 177 F. Supp. 2d 635, 646-47.  However, these cases make clear that to establish the requisite knowledge of underlying cybersquatting, a trademark

---

[9] It is Go Daddy's position that Courts should not expand the scope of secondary liability in this context.  The very nature of cybersquatting implicates a host of service providers – domain name registrars and registries, website hosts, and others providing servers that facilitate domain name resolution.  Embroiling these companies in litigation simply because they provided automated services and declined to terminate such services upon receipt of notice of a domain name dispute would be directly contrary to Congress's intent in enacting the ACPA.

plaintiff would have to make a showing well beyond notice of a cybersquatting claim.  As

explained by the *Ford Motor* court:

> [B]ecause the ACPA requires a showing of 'bad faith intent' – a subjective
> element not required under traditional infringement, unfair competition, or
> dilution claims – the standard would be somewhat heightened.  For example, it
> would be insufficient that an entity such as [a registrar] were merely aware that
> domain names identical or similar to protected marks were being sold over its
> website.  Rather, because legitimate uses of others [*sic*] marks are protected under
> the ACPA, a plaintiff would have to demonstrate that the "cyber-landlord" knew
> or should have known that its vendors had no legitimate reason for having
> registered the disputed domain names in the first place.  Because an entity such as
> [a registrar] generally could not be expected to ascertain the good or bad faith
> intent of its vendors, contributory liability would apply, if at all, in only
> exceptional circumstances.

*Ford Motor*, 177 F. Supp. 2d at 647; *accord Solid Host*, 652 F. Supp. 2d at 1114.

Here, Petronas does not allege that Go Daddy induced the registrant of the Disputed

Domains to engage in cybersquatting, nor is there any evidence of such inducement.  Rather,

Petronas bases its contributory cybersquatting claim on the allegations that Go Daddy continued

supplying its forwarding service to the registrant after it knew or should have known that the

registrant was cybersquatting.  This claim cannot survive summary judgment for multiple reasons.

### 1.    Petronas Has Not Established Direct Cybersquatting

Preliminarily, Petronas cannot proceed with its contributory cybersquatting claim because

it has not adduced sufficient evidence for a jury to conclude that the registrant of the Disputed

Domains engaged in cybersquatting.  Discovery has closed, yet Petronas has not obtained, nor

even sought, any discovery from the party that allegedly engaged in cybersquatting.  Without such

discovery, it is impossible to determine the registrant's motives in registering the Disputed

Domains, and thus whether he acted with bad faith intent to profit from the Petronas's trademarks.

Petronas has offered insufficient evidence of the registrant's intent beyond the fact that the

Disputed Domains included the letter string "petronas."  Moreover, Petronas has admitted that it is

not aware of any complaints from customers regarding the Disputed Domains.  Slafsky, Ex. 9

(Gaik, 55:5-16).  There is simply no record for determining bad faith intent to profit.

**2.    Go Daddy Did Not Exercise "Direct Control and Monitoring" of the Alleged Cybersquatting**

Even assuming the registrant of the Disputed Domains was engaged in cybersquatting, Go Daddy cannot be held liable as a "secondary cybersquatter" because by providing registration and routing services to the registrant, Go Daddy did not exercise the type of control required to establish a contributory infringement claim against a service provider.  Indeed, the Ninth Circuit already held as much in *Lockheed*.  There, a trademark owner sued a domain name registrar for contributory trademark infringement based upon the registrar's registration of domain names containing the plaintiff's marks, routing Internet users to websites the registrant associated with the marks, and refusing to cancel the registrations upon notice of a trademark domain name dispute.  *Lockheed*, 194 F.3d at 982-83.  The Court affirmed the district court's grant of summary judgment to the defendant registrar on this claim because domain name registration and routing are a service, rather than a product, and providing routing "does not entail the kind of direct control and monitoring required to justify an extension of the 'supplies a product' requirement."  *Id.* at 984-85.  The facts here are virtually identical and mandate the same result.  Go Daddy provided registration and routing services to the registrant of the Disputed Domains, but it exercised no control over the alpha-numeric string selected by the registrant - the act that allegedly amounted to cybersquatting.  Unlike the landlord of a flea market who licenses real estate and can reasonably be expected to monitor the merchandise sold on his premises, a domain name registrar cannot reasonably be expected to monitor the millions of domain name registrations that occur every year to determine whether the domain names include a trademark, and if so, to determine the registrants' authorization and intent.  *See id.* at 985; *see also Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 689 (D. Md. 2001).

**3.    Go Daddy Did Not Have Knowledge That the Registrant was Cybersquatting**

Go Daddy also is entitled to summary judgment on Petronas's contributory cybersquatting claim for the independent reason that there are no "exceptional circumstances" that would justify imputing to Go Daddy knowledge that the registrant registered the Disputed Domains with a bad

1    faith intent to profit from Petronas's mark.  A domain name registrar is not generally expected to

2    ascertain the good or bad faith intent of its registrants.  *Ford*, 177 F. Supp. 2d at 647.  It is well

3    established that receipt of a demand from a trademark owner is insufficient to impute knowledge.

4    *See, e.g., Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 963-64 (C.D. Cal.

5    1997).  In fact, Petronas's submissions to Go Daddy (which attempted to comply with Go Daddy's

6    policy for claims pertaining to infringement on websites *hosted* by Go Daddy) simply reflected

7    that Petronas owned rights in the mark "PETRONAS," and provided insufficient information from

8    which Go Daddy could determine that the registrant was engaged in cybersquatting.  Hanyen, Exs.

9    9, 11.  Go Daddy followed its policies and standard operating procedures in handling these claims,

10   and referred Petronas to the UDRP, as was required by its agreement with ICANN.  *See* infra at 7-

11   9.  There simply is no evidence to support a finding of "exceptional circumstances" that would

12   warrant imputing to Go Daddy in 2009 and 2010 knowledge that the registrant registered the

13   Disputed Domains with a bad faith intent to profit from Petronas's mark.

14          Finally, requiring domain name registrars to conduct extensive investigations into a

15   registrant's intent in registering a domain name upon receipt of notice from a trademark owner of

16   alleged cybersquatting is wholly impractical.  This practice would impose a heavy burden and

17   would contravene Congress's intent in enacting the ACPA.  Go Daddy currently maintains over 50

18   million domain names.  *See* Hanyen, ¶ 2.  It currently receives notice of more than a thousand

19   trademark claims every year (Slafsky, Ex. 12 (Bilunes, 16:8-14); *id.,* Ex. 10 (Hanyen (10/12/2011),

20   51:2-6); *id.,* Ex. 15 (Simonini, 6:16-19)), and that number is steadily increasing.  Slafsky, Ex. 13

21   (Ede, 30:10-22).  While a flea market operator can send someone to its property to periodically

22   monitor what is being sold, there is no simple way for Go Daddy to determine whether a registrant

23   is cybersquatting.  A determination of bad faith intent to profit from another's mark requires

24   consideration of not only the nine permissive factors set forth in 15 U.S.C. § 1125(d), but also the

25   totality of the circumstances.  *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811

26   (6th Cir. 2004).  Moreover, a determination of cybersquatting would require a consideration of the

27   trademark owner's rights, which are dynamic over time, thereby making a mere assertion of rights

28   uncertain.  *See Lockheed*, 985 F. Supp. at 963.  All of these complexities and uncertainties make

imposing an obligation on registrars to determine whether a particular registrant is cybersquatting

far more burdensome than the obligation imposed on a flea market operator to police its own space

upon notice of infringement.  They also make it unreasonable to impute knowledge of

cybersquatting to registrars like Go Daddy who refer parties complaining about use of a trademark

in a domain name to the UDRP and maintain the status quo until receipt of a transfer order.  *Cf.*

*Lockheed*, 985 F. Supp. at 965-66.   For this reason, the district court in *Lockheed II* recognized

that

> The reason the UDRP was developed was to provide the mechanism to resolve
> these disputes.  Not only would imposing plaintiff's scheme render the UDRP
> nugatory, it would cause the domain name registration system in its entirety not to
> be feasible.

*Lockheed II* at 655.

## C.   GO DADDY IS NOT LIABLE UNDER THE ACPA FOR PERFORMING BASIC REGISTRAR FUNCTIONS

In addition to failing for lack of evidence, Petronas's cybersquatting claim also fails

because it is clear from the statute, the legislative history, and the supporting case law that

registrars are not liable under the ACPA for performing registrar functions.  The ACPA

"effectively codifies the pre-2000 case law . . . which held that a registrar that reserved or

registered an allegedly infringing domain name was not responsible as a direct or contributory

trademark infringer."  4 McCarthy on Trademarks and Unfair Competition § 25:73.40 (4th ed.

2010).  Courts that have addressed the issue of registrar liability have uniformly recognized that

registrars who are performing the functions of a registrar are not liable under the Act.  As the

district court recognized in *Lockheed II*:

> It is quite understandable that Congress did not cause defendant as a domain name
> registrar . . . to be subject to civil liability under § 1125(d). . . .  Sheer volume
> alone would prohibit defendant performing the role plaintiff would assign.
> Defendant simply could not function as a registrar . . . if it had to become
> entangled in, and bear the expense of, disputes regarding the right of a registrant
> to use a particular domain name. . . .  The reason the UDRP was developed was to
> provide the mechanism to resolve these disputes.

*Lockheed II* at 655.  *See also*, *Solid Host,* 652 F. Supp. 2d. at 1104-05 ("where the record indicates

that a defendant did nothing more than act as a registrar, no liability under § 1125(d) will lie");

1   *Verizon California, Inc. v. OnlineNIC, Inc.*, 647 F. Supp. 2d 1110, 1126 (N.D. Cal. 2009)

2   (recognizing immunity for registrar acting as registrar);  *Bird*, 289 F.3d. at 877-81(finding domain

3   name registrar not liable for trademark infringement, unfair competition, trademark dilution, or

4   violations of the ACPA).

5           Here the record establishes that Go Daddy did nothing more in providing forwarding

6   services and maintaining the Disputed Domains than act as a registrar.  The Ninth Circuit has

7   explained the role of a registrar as "differ[ing] little from that of the United States Postal Service:

8   when an Internet user enters a domain-name combination [into his or her Internet browser], [the

9   registrar] translates the domain-name combination to the registrant's IP Address and routes the

10  information or command to the corresponding computer."  *Lockheed Martin Corp. v. Network*

11  *Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999).  Just as delivery of the mail does not subject

12  the Postal Service to liability for the contents of packages that pass through its service, a

13  registrar's routing of an Internet user to a website – as directed by a domain name registrant in an

14  automated process – does not take that registrar outside the role of a registrar.  *See Id*. at 984-85

15  (agreeing with district court that registration and routing of domain name does not extend

16  registrar's involvement beyond registration services); *Lockheed II*, 141 F. Supp. 2d at 651-55

17  (defendant, which maintained directory linking domain names with IP number of domain

18  nameservers that connected the domain names with other Internet computers that host websites

19  not subject to ACPA liability); Order Granting Go Daddy's Motion for Judgment on the

20  Pleadings, at 3 (noting that in *Lockheed*, "the defendant [registrar] was not liable based on its

21  'routing' of a domain-name registrant's allegedly infringing domain name, as the 'routing' was

22  simply a 'service' connected to the registration service.").

23          The evidence submitted by Go Daddy demonstrates that forwarding is simply a form of

24  routing.  *See Palage*, ¶¶ 41 - 56.  That evidence also demonstrates that forwarding is a service

25  almost universally offered by registrars to registrants as part of the registration service.  *See id.* ¶¶

26  13, 42, 49.  It is essentially the same function that the Court in *Lockheed II* concluded would not

27  subject a registry to ACPA liability.  *See* 141 F. Supp. 2d at 651, 654-55.  Because routing is part

28

of the basic registration service provided by registrars, Go Daddy cannot be liable under the ACPA

for providing this service and maintaining the registrations.

### D.   PETRONAS'S UNFAIR COMPETITION CLAIMS FAIL WITHOUT VIABLE CYBERSQUATTING CLAIMS

Petronas's remaining claim is based on the exact same factual allegations as the above-discussed ACPA claims and is otherwise "substantially congruent" to those claims.  *See* FAC, ¶¶ 97-101.  The Ninth Circuit has "consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (affirming grant of summary judgment as to derivative state law claims where summary judgment was properly granted as to underlying Lanham Act claims); *see also Appliance Recycling Ctrs. of Am., Inc. v. JACO Envtl., Inc.*, No. 09-55168, 378 Fed. Appx. 652, 656 (9th Cir. May 4, 2010) (same); *Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*, 84. F.3d 1143, 1152 (9th Cir. 1996) (same).  Since summary judgment must be granted on the ACPA claims, it also must be granted on Petronas's derivative state law claim.  *See* Dkt. No. 67 ¶ 8 (dismissing derivative state law claims because underlying Lanham Act claims failed as a matter of law).

### E.   THE COURT SHOULD CANCEL PETRONAS'S TRADEMARK REGISTRATION

In support of its claims, Petronas relies on a U.S. trademark registration, Reg. No. 2969707 for the mark PETRONAS AND DESIGN (the "Registration").  FAC, ¶ 60.  The Lanham Act gives federal courts authority to cancel an invalid trademark registration.  15 U.S.C. § 1119; *see also Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) ("Where, as here, a registrant's asserted rights to a mark are shown to be invalid, cancellation is not merely appropriate, it is the best course").  Indeed, a court must cancel a registration after finding the underlying mark is unenforceable. *Gracie v. Gracie*, 217 F.3d 1060, 1065-66, 1072 (9th Cir. 2000) (reversible error to deny request for cancellation after verdict found mark unenforceable).  Federal courts may cancel registrations based on the same grounds as the U.S. Patent and Trademark Office ("USPTO").

1   *D. & M. Antique Imp. Corp. v. Royal Saxe Corp.*, 311 F. Supp. 1261, 1268 (S.D.N.Y. 1969).  One

2   such ground is abandonment.  15 U.S.C. § 1064(3).  Another ground is violation of the Lanham

3   Act provision concerning trademark registrations based on international conventions.  *Marmark*

4   *Ltd. v. Nutrexpa S.A.*, 12 U.S.P.Q.2d 1843, 1845 (T.T.A.B. 1989).  The Registration should be

5   cancelled on both grounds.

6                    **1.      The Registration Is Invalid Due to Abandonment**

7             The Lanham Act, 15 U.S.C. § 1127, provides that a trademark is abandoned "[w]hen its use

8   has been discontinued with intent not to resume such use . . . [n]onuse for 3 consecutive years shall

9   be prima facie evidence of abandonment."  Establishing three consecutive years of non-use creates

10  a *prima facie* case of abandonment.  15 U.S.C. § 1127; *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.

11  3d 407, 411 (9th Cir. 1996).  As to foreign registrants, in particular, a *prima facie* case of

12  abandonment is established where the registrant fails to use the mark in U.S. commerce within

13  three years of registration.  *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1582-83

14  (Fed Cir. 1990).

15            Under the Lanham Act, only certain uses establish a party's rights in the trademark and

16  prevent a finding of abandonment.  *Sensient Tech. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d

17  754, 763 (8th Cir. 2010).  The statute sets forth the basic requirements:

18            [A] mark shall be deemed to be in use in commerce--

19            **(1)** on goods when --

20            **(A)** it is placed in any manner on the goods or their containers or the displays
              associated therewith or on the tags or labels affixed thereto, or if the nature of the
21            goods makes such placement impracticable, then on documents associated with the
              goods or their sale . . .
22

23  15 U.S.C. § 1127.  The first requirement – known as the "affixation" requirement – mandates that

24  the registered mark appear physically on the goods sold to consumers.  The second requirement –

25  known as the "in commerce" requirement – mandates a sale or transportation of the goods in

26  United States interstate commerce or in United States commerce with a foreign nation.  *Id.*

27            To satisfy these statutory requirements, a trademark specimen must be a label, tag, or

28  container for the goods, or a point-of-purchase display associated with the goods.  37 C.F.R. §

1   2.56(b)(1).  In contrast, use of a trademark on brochures, folders, or other materials that describe

2   goods and their characteristics is generally considered advertising use and fails the affixation

3   requirement.   Trademark Manual of Examining Procedure ("TMEP") § 904.03(g) (8th ed. Oct.

4   2011).

5          Here, the Registration was issued by the USPTO on July 19, 2005, covering an extremely

6   long list of goods ranging from "air conditioners" to "manure" to "flares."  Slafsky, Ex. 7.

7   However, Petronas has failed to produce evidence that it has "used" the registered PETRONAS

8   AND DESIGN mark on these goods in U.S. commerce.  In particular, Petronas has failed to

9   produce evidence to demonstrate both affixation of the mark on the goods *and* sale or

10  transportation of the goods in United States interstate commerce or in United States commerce

11  with a foreign nation, as required by 15 U.S.C. § 1127.  Nor has Petronas made any showing that

12  these requirements are impractical.  Because Petronas has not satisfied the trademark-use

13  requirements of the Lanham Act, the Court should cancel the Registration due to abandonment.

14          **2.        The Registration is Void for Exceeding the Scope of the Underlying
                         Registration**

15

16          The Lanham Act allows foreign parties to obtain a U.S. trademark registration based upon

17  a mark previously registered in a country of origin that is subject to the Paris Treaty.  *See* 15

18  U.S.C. § 1126(e) (otherwise referred to as § 44(e)).  These registrants are exempted from the

19  general requirement of demonstrating U.S. trademark use before registration.  TMEP § 1009.

20  However, a mark registered pursuant to § 44(e) cannot exceed the scope of protection allowed by

21  its foreign counterpart in the registrant's country of origin. *Oromeccanica, Inc. v. Ottmar*

22  *Botzenhardt GmbH & Co.*, *KG*, 226 U.S.P.Q.2d 996, 999 (C.D. Cal. 1985); 4 McCarthy on

23  Trademarks and Unfair Competition § 29:12 (4th ed. 2010).  In particular, a registration based on

24  § 44(e) is invalid where the registrant claims rights to the mark for goods and services beyond

25  those listed in the underlying foreign registrations.  *Marmark*, 12 U.S.P.Q.2d at 1845; *In re*

26  *Lowenbrau Munchen*, 175 U.S.P.Q. 178 (TTAB 1972); *see also,* 37 C.F.R. § 2.32(a)(6); TMEP §

27  1012.  Because § 44 represents an exception to the general use requirements, this prohibition as to

28

1  scope is strictly enforced, and the goods identification in the underlying foreign trademark

2  registrations must be construed narrowly.  *Marmark Ltd. v. Nutrexpa S.A.*, *supra*.

3         Here, Petronas secured the Registration pursuant to § 44(e) based on underlying trademark

4  registrations in Malaysia (Reg. Nos. 93007563, 93007564 and 93007565).  Significantly, however,

5  the goods in the Registration exceed the scope of goods in the underlying Malaysia registrations.

6  As set forth in Slafsky, Ex. 8, a number of specific goods in the Registration plainly exceed the

7  scope of the goods in the Malaysia registrations, in violation of the Lanham Act.  These defects,

8  too, compel cancellation of the Registration.

9  **V.      CONCLUSION**

10        For the foregoing reasons Go Daddy respectfully requests that the Court grant its motion.

11

12  Dated:  November 2, 2011                    WILSON SONSINI GOODRICH & ROSATI
                                               Professional Corporation
13

14

15                                             By: /s/  John L. Slafsky
                                                  JOHN L. SLAFSKY
16                                                DAVID L. LANSKY
                                                  HOLLIS BETH HIRE
17
                                               Attorneys for Defendant/Counterclaimant
18                                             GODADDY.COM, INC.

19

20

21

22

23

24

25

26

27

28