UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PETROLIAM NASIONAL BERHAD,

    Plaintiff,

    v.

GODADDY.COM, INC.,

    Defendant.

_____/

No. C 09-5939 PJH

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING IT IN PART; ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant's motion for summary judgment and plaintiff's motion for partial summary judgment came on for hearing before this court on December 7, 2011. Plaintiff appeared by its counsel Perry R. Clark, and defendant appeared by its counsel John L. Slafsky. Having read the parties' papers, including the supplemental briefs and the briefs of amici curiae, and having carefully considered the arguments of counsel and the relevant legal authority, the court hereby GRANTS defendant's motion in part and DENIES it in part, and DENIES plaintiff's motion.

## INTRODUCTION

This is a case brought under the Lanham Act, alleging cybersquatting and contributory cybersquatting, and also alleging state law claims of unfair competition. Plaintiff Petroliam Nasional Behad ("Petronas") is the national oil company of Malaysia, and is wholly-owned by the Government of Malaysia. Defendant GoDaddy.com, Inc. ("GoDaddy.com" or "Go Daddy") is a domain name registrar, with over 50 million domain names registered by customers around the world.

Petronas asserts that two domain names – www.petronastower.net and www.petronastowers.net (the "Disputed Domains") – which were registered by Go Daddy, were used by one or more non-parties to violate its trademark rights by

cybersquatting. Petronas seeks to hold Go Daddy liable for cybersquatting and for contributory cybersquatting, on the basis that the non-party registrant used Go Daddy's automated systems to point the domain names to a pornographic website that was hosted elsewhere. Go Daddy seeks to have the Petronas Mark declared invalid.

## THE DOMAIN NAME SYSTEM

The Internet is a network of interconnected computers and computer networks. See, e.g., Reno v. ACLU, 521 U.S. 844, 849-53 (1997); Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 874-75 (9th Cir. 2002). Every computer connected to the Internet has a numerical address known as an "Internet Protocol Address" or "IP Address," required for one computer to communicate with another. Few people access websites by typing the IP Address. Instead, an Internet user types an alpha-numeric "domain name" that represents the IP Address into his/her web browser.

In response to the entry of a domain name, the user's computer communicates back and forth with the Domain Name System ("DNS"), a set of servers that allow the user to locate the IP Address for the computer that hosts the desired website. The DNS does not provide any website content, but instead functions as the Internet's equivalent of "directory assistance." The fundamental building block of the DNS is the "nameserver," which is a database of IP Addresses.

The orderly process for acquiring domain names enables the DNS to function properly. The rights to domain names are sold to the public in a process known as "domain name registration." Domain name "registries," the entities responsible for maintaining the authoritative, master list of all domain names, do not deal directly with the general public. Rather, a person who registers a domain name does so through a domain name "registrar" such as Go Daddy.

The registrar is the designated intermediary between the domain name registrant and the domain name registry. Go Daddy and all other registrars are accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN"), the international non-profit corporation that has been designated by the United States government to manage

and coordinate domain names and IP Addresses.

A registrant chooses a registrar to provide the registration services. That registrar becomes the designated registrar for the selected domain name. Only the designated registrar may modify or delete information about domain names in a central registry database. After registering the domain name, the registrant uses an online dashboard provided by the registrar to designate the nameserver information concerning where the website is hosted. The registrar's participation in this process is entirely automated.

## DOMAIN NAME RESOLUTION AND ROUTING

"Domain name resolution" is the process whereby the DNS converts a domain name into an IP Address that points to a computer hosting a website. Resolution is a multi-step process involving a series of lookups ("resolutions") on various servers. In order for the user's browser to determine which computer on the Internet to access, the browser performs a domain name lookup and translates that domain name into a unique IP Address.

This resolution request is initially sent to the DNS resolver that is part of the user's local operating system. Following a series of queries to the local nameserver of the user's Internet Service Provider ("ISP"), and to the DNS databases, the authoritative domain nameserver eventually returns the IP Address of the computer hosting the sought Internet content. The ISP local nameserver then returns this information to the user's DNS resolver, which makes it possible for the user's computer to access the Internet content.

This resolution process, by which the user obtains the IP address of the computer hosting the desired Internet content from the authoritative domain nameserver, is commonly referred to as "routing." Registrars like Go Daddy play a critical role in the process by giving the registrant an efficient means to configure the nameserver to point the user to the desired Internet content. If registrars stopped performing the function of taking name server information and providing it to registries, the Internet would not function.

Using the registrar's "dashboard," the registrant can choose from several options to point his domain name to content. The registrant can do nothing, in which case the

nameserver might route to a "coming soon" page or to a page with other default information. In the alternative, the registrant can configure the nameserver so that it routes either to a "record not found" error message, or to a newly created website on a server hosted by the registrar or some third party, or to an existing website already associated with another domain name.

This last form of routing is referred to as "domain name forwarding." When a registrant elects to route his domain name in this fashion, an Internet user typing the forwarded domain name into his web browser will be automatically directed to the pre-existing website. From the Internet user's perspective, there is no difference between forwarding and other forms of routing.

## FACTUAL BACKGROUND

Petronas is based in Kuala Lumpur, Malaysia. Its official website is www.petronas.com.my, and it owns several additional U.S.-based websites that incorporate the name "Petronas." Petronas uses the www.petronastwintowers.com.my domain name for the official website of the Petronas Twin Towers (the headquarters of Petronas).

In May 2003, a third party registered two domain names, www.petronastower.net and www.petronastowers.net (the "Disputed Domains"), with the domain registrar eNom.com ("eNom"), and also pointed – or "forwarded" – the Disputed Domains to a pre-existing website featuring pornography. For most of the time between May 29, 2003 and November 11, 2006, at least one of the Disputed Domains was directed to a website displaying pornography. On April 1, 2007, the then-registrant – Heiko Schoenekess – changed registrars from eNom to Go Daddy. Schoenekess used Go Daddy's online "dashboard" to automatically forward the Internet traffic for the Disputed Domains to the same pornographic website with which they had previously been associated.

It was not until November 26, 2009 that Petronas learned that the domain name petronastower.net had been registered with GoDaddy.com, by a third party. Petronas asserts that it immediately advised Go Daddy of the unauthorized use of the "petronastower" name, and requested that Go Daddy cease its "direct and contributory

4

infringement" of Petronas' mark.

Go Daddy responded on November 30, 2009, stating that it would not tolerate illegal content on its customers' websites, and would cooperate with law enforcement to get any such websites taken down. Go Daddy further informed Petronas that

> any disputes over the ownership or wording of the domain name itself will need to be sent to either the registrant, through an arbitration forum such as World Intellectual Property Organization . . . or the local court system. Per ICANN regulations, domain registrars are prohibited from becoming involved in domain ownership disputes.

Nevertheless, instead of utilizing an arbitration procedure, which it had successfully used previously, Petronas submitted a trademark claim to Go Daddy on December 16, 2009. Petronas attached a copy of Go Daddy's "Trademark and/or Copyright Infringement Policy" to the claim. That policy states, with regard to "Domain Name Dispute Claims:"

> Please refer to the Uniform Domain Name Dispute Resolution Policy ("the UDRP") if you have a concern or dispute concerning a domain name. The UDRP covers domain name disputes; this policy specifically excludes domain name disputes.

Go Daddy responded the same day, informing Petronas that although the domain name petronastower.net was registered through Go Daddy, "the domain is forwarding to a website that is hosted elsewhere," and that "[a]ny issues regarding the content of the website will need to be addressed to the owner of the site, either directly, or to the hosting provider."

Further, consistent with its stated policy, Go Daddy reiterated:

> We can only process claims of trademark infringement against the content of websites that we host. ICANN, the managing body of the internet, domain name registrars, specifically prohibits domain registrars from becoming involved in disputes over domain ownership in their Uniform Domain Name Dispute Resolution Policy. Any disputes over the ownership or wording of the domain name itself will need to be sent either to the owner, or through an arbitration forum, or the local court system.

As an ICANN-accredited registrar, Go Daddy is required to implement and follow the UDRP for disputes concerning domain names. That policy requires registrars, other than in exceptional circumstances, to maintain the status quo during a domain name dispute until receipt of directions from the registrant, an order from a court or arbitral tribunal, or the

5

decision of an administrative panel. Additionally, as Go Daddy informed Petronas, the UDRP specifically prohibits registrars from becoming involved in disputes over domain name ownership.

During the following two weeks, Petronas continued urging Go Daddy to disable the domain name and website. In addition, on December 16, 2009, Petronas attempted to contact the registrar of the allegedly infringing petronastower.net domain name by using contact information provided by Go Daddy. Petronas requested that the registrant immediately cease its use of the petronastower domain name. According to Petronas, it did not receive a response to its e-mail, and calls to the telephone number went to an answering machine with a recorded message asking for a "10-digit YAK message followed by the hash sign."

On December 18, 2009, Petronas filed the present action. Petronas subsequently filed an in rem action against Petronastower.net (No. C-10-0431), and on May 13, 2010, the court granted Petronas' motion to transfer ownership of the domain name. Final judgment was entered in that case on June 14, 2010.

In July 2010, Petronas discovered that the domain name petronastowers.net had also been registered with Go Daddy by a third party, and was set to forward to a website that was located elsewhere. Just as before, counsel for Petronas submitted a trademark claim to Go Daddy, and included a copy of Go Daddy's policy stating that domain name disputes were governed by the UDRP. Again, Go Daddy immediately responded that issues regarding the content of the transferee website had to be addressed with the owner of the website or the hosting provider. Go Daddy reiterated that it was prohibited by ICANN and the UDRP from getting involved in such disputes.

On July 12, 2010, Petronas filed a second in rem action (C-10-3052) against Petronastowers.net, and a motion to transfer ownership of that domain name. The motion was granted on August 27, 2010. Final judgment was entered in that case on September 9, 2010.

Meanwhile, Go Daddy had moved for judgment on the pleadings in the present

6

action, and the motion was granted as to all causes of action, in an order issued September 9, 2010. On September 29, 2010, Petronas filed a first amended complaint (FAC), asserting three causes of action – (1) cybersquatting, in violation of 16 U.S.C. § 1125(d) (the Anticybersquatting Consumer Protection Act or "ACPA"); (2) contributory liability for cybersquatting; and (3) unfair competition, under California Business & Professions Code § 17200 and California common law.

Go Daddy filed a motion to dismiss the FAC for failure to state a claim. The court issued an order on May 5, 2011 denying the motion, stating that it was unable to resolve a number of issues raised in the motion in the absence of a developed record.

> Among other things, the court requires a record clarifying the mechanics of what GoDaddy did or does with regard to the disputed domain names, and what "forwarding" and "routing" are and whether either or both can be considered part of domain name registration services generally or the services offered by GoDaddy. In addition, while the court has certain reservations concerning the adequacy of the pleading, it has concluded that dismissing the first amended complaint with leave to amend, and then toiling through yet another round of briefing on motions to dismiss, would not be productive.

May 5, 2011 Order at 1-2.

Go Daddy now seeks summary judgment as to all causes of action asserted in the FAC, and as to its counterclaim for cancellation of registration. Petronas seeks partial summary judgment, as to the claim for contributory cybersquatting.

## DISCUSSION

A.  Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome

7

of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 994 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson, 477 U.S. at 250; see also Fed. R. Civ. P. 56(c), (e).

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

B.  The Parties' Motions

    1.  Direct cybersquatting claim

Go Daddy seeks summary judgment on the claim of direct cybersquatting. "Cybersquatting" is the bad faith registration of a domain name that is identical or confusingly similar to another's distinctive mark. 15 U.S.C. § 1125(d)(1)(A). The ACPA establishes civil liability for "cyberpiracy" where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted "with bad faith intent to profit from that mark." 15 U.S.C. §1125(d)(1)(A); see also DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1218-19 (9th Cir. 2010); Bosley Medical Inst., Inc. v. Kremer, 403 F.3d 672, 680 (9th Cir. 2005).

Go Daddy argues that there is insufficient evidence for a reasonable juror to find for Petronas on element (1) or element (3). Go Daddy also asserts that the cybersquatting

8

claim fails as a matter of law because the ACPA provides domain name registrars with a clear "safe harbor" from liability for registration or maintenance of a domain name for another, absent a bad faith intent to profit from such registration or maintenance of the domain name. See 15 U.S.C. § 1114(2)(D). Because the court finds that Petronas has not provided evidence sufficient to raise a triable issue with regard to the elements of the claim, the court does not address Go Daddy's alternative argument regarding the applicability of the ACPA "safe harbor" provision.

With regard to element (1), Petronas alleges in the FAC that Go Daddy is liable under the ACPA for "using" the Disputed Domains to route Internet users via GoDaddy nameservers to a third-party website. Go Daddy asserts, however, that there is no evidence that it has "used" the Disputed Domains as the registrant or as the registrant's authorized licensee, and that only the domain name registrant or the registrant's authorized licensee can "use" a domain name for purposes of the ACPA.

Go Daddy notes that it is undisputed that it was Heiko Schoenekess, not Go Daddy, that was the registrant of the Disputed Domains. Thus, Go Daddy asserts, it can be liable only if it was the "authorized licensee" of the registrant. Go Daddy contends, however, that there is not a shred of evidence supporting a finding that Go Daddy acted as Schoenekess' authorized licensee – no evidence of any communication between Go Daddy and Schoekeness to that effect, and no evidence of any contractual arrangement to that effect.

Moreover, Go Daddy argues, its conduct is not the type of "use" that is covered by the ACPA, as Go Daddy neither created the website to which the Disputed Domains pertain, nor placed any content on such website, nor ever had any association with such website. Go Daddy contends that the ACPA is directed toward the illegitimate uses of a domain name in which the user is attempting to profit from the value of a trademark (citing Ford Motor Co. v. Greatdomains.com, Inc., 177 F.Supp. 2d 635, 642 (E.D. Mich. 2001)). Go Daddy contends that as a registrar, its role was limited to providing the infrastructure for the registrant to route the Disputed Domains automatically to a website of his own choosing, which is not the type of illegitimate use contemplated by the statute.

In opposition, Petronas asserts that element (1) is satisfied because Go Daddy "used" the Disputed Domains when it acted as the registrant's authorized licensee. Petronas points to Go Daddy's form agreement with the registrant (Go Daddy's "Universal Terms of Service"), pursuant to which the registrant granted Go Daddy the "right to terminate [the registrant's] access to Services at any time, without notice, for any reason whatsoever." Under the agreement, "Services" included "using our systems to forward a domain, URL, or otherwise to a system or site hosted elsewhere."

Petronas also cites to the deposition testimony of one of Go Daddy's designated witnesses, claiming that the witness testified that she was unaware of anything in any of the agreements between Go Daddy and the registrant of the domain names petronastower.net and petronastowers.net that would have prevented Go Daddy from stopping its domain name forwarding service for those domain names."[1] Based on this, Petronas asserts that Go Daddy's agreements with the registrant granted it a license to freely use the Disputed Domains in connection with the domain name forwarding service and to continue or discontinue the service based on Go Daddy's own independent decision.

With regard to element (3), Go Daddy asserts that there is no evidence that it acted with a "bad faith intent to profit" from Petronas' trademark. A finding of "bad faith" is an essential prerequisite to finding an ACPA violation, though it is not required for general trademark liability. Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1202 (9th Cir. 2009). In determining whether a person has a "bad faith intent" as described above, the court "may consider" any or all of the nine factors listed in 15 U.S.C. § 1125(d)(1)(B)(i). In addition, however, "bad faith intent" will not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful. 15 U.S.C. § 1125(d)(1)(B)(ii).

Go Daddy asserts that there can be no evidence of any bad faith intent on its part

---

[1] The court notes that the transcript of the deposition of the Go Daddy witness in question reflects that in response to the question whether anything in the agreements would have prevented Go Daddy from stopping the forwarding service, the witness responded, "I don't know" – not that she was "unaware of anything" like that in the agreements.

10

because the forwarding of the Disputed Domains to a third-party website was an automated function, with no volitional input by Go Daddy. Go Daddy contends that the evidence shows that the registrant of the Disputed Domains utilized the system to cause the Internet users who typed the Disputed Domains into their browsers to be routed to an existing website hosted by a third party. Thus, Go Daddy argues, absent any volitional conduct on its part, it cannot be liable under a statute that requires intentional conduct.

Go Daddy also contends that there is no evidence of any "bad faith" intent arising from its maintenance of the Disputed Domains after it was notified by Petronas of its alleged trademark claims. Go Daddy asserts that the nine factors that courts may consider when evaluating whether the defendant acted with bad faith intent are generally inapplicable to registrars. In addition, Go Daddy notes that under § 1125(d)(1)(B)(ii), bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."

Go Daddy argues that the undisputed evidence shows that Go Daddy's intent in maintaining the Disputed Domains following notice of Petronas' alleged trademark claims until receipt of a transfer order was to comply with Go Daddy's standard operating procedures and to implement the UDRP. Go Daddy contends that it drafted its standard operating procedures to comply with the UDRP, to which it is bound under its accreditation agreement with ICANN. Thus, Go Daddy took no action on Petronas' trademark claims other than providing Petronas with information to assist it in obtaining a transfer order, and locking each of the domain names upon notice of commencement of a legal proceeding until receipt of a transfer order.

Go Daddy also notes that the term "bad faith" has a specific meaning in the context of the ACPA. "The bad faith required to support a cypersquatting claim is not general bad faith, but a 'bad faith intent to profit from the mark.'" Solid Host, NL v. Namecheap, Inc., 652 F.Supp. 2d 1092, 1109 (C.D. Cal., 2009) (quoting 15 U.S.C. § 1125(d)(1)(A)(i)). Go Daddy argues that there is no evidence in this case that it acted with an intent to profit, as it

11

does not charge registrants for utilizing domain name forwarding as a means of routing their domain names, and it did not profit from the registrant's use of the forwarding service to route the Disputed Domains to a website hosted by a third party.

Go Daddy asserts further that there is no evidence that it acted to profit from Petronas' specific trademark. Go Daddy contends that the record shows that the registrant of the Disputed Domains, in transferring the registrations to Go Daddy, represented that each registration was being made "in good faith" that he had "no knowledge of it infringing upon or conflicting with the legal rights of a third party or a third party's registration, trademark, or trade name." Thus, Go Daddy argues, there was no basis for it to believe at the time the registrations were transferred that the registrant intended any unlawful conduct, and that in any event, there is no evidence that Go Daddy maintained the registrations with any intent to profit from Petronas' marks.

In opposition, Petronas asserts that Go Daddy's argument regarding "volitional conduct" is irrelevant to the cybersquatting claim, as the conduct that forms the basis of the claim is Go Daddy's repeated refusal to stop forwarding the Disputed Domains after it was put on notice by Petronas of the infringement of Petronas' trademarks. Petronas argues that regardless of what Go Daddy claims its intent was, it is undisputed that Go Daddy took no action on Petronas' trademark claims other than providing Petronas with information to assist it in seeking a transfer order, and locking each domain.

Petronas also contends that Go Daddy "intended to profit" from Petronas' marks by establishing its immunity from liability for its conduct concerning the Disputed Domains. Petronas claims that because the conduct alleged in this lawsuit is the same as Go Daddy's conduct with respect to as many as 9,000 other domain names over the years (referring to Go Daddy's claim that it receives notice of more than 1,000 trademark claims every year, out of the 8.2 million domain names for which it provides forwarding services), Go Daddy's exposure to statutory damages should it be found liable for cybersquatting in all those cases could potentially be between $9 million and $900 million (based on statutory damages of between $1,000 and $100,000 per domain name) – not to mention possible

12

treble damages and attorney's fees. Petronas contends that the evidence shows that Go Daddy was aware that it faced exposure to damages based on its provision of forwarding services for its customers who use it to commit trademark infringement.

The court finds that the motion must be GRANTED. The forwarding of the Disputed Domains does not amount to "use" of the domain names. Domain name forwarding is a standard service that has been provided by Go Daddy and virtually all registrars for more than a decade. Go Daddy provides forwarding services for millions of domain names under its management, and has provided such service in combination with its other domain name routing services since 2002 or before.

Go Daddy does not charge customers for domain forwarding, but rather offers this routing option as part of its registration services. Go Daddy's registration customers, using Go Daddy's dashboard, can configure the nameserver to forward a domain name to an existing website. This automated process is accomplished without any interaction between the registrant and Go Daddy personnel.

The evidence shows that Go Daddy simply provided the infrastructure to the registrant to route the Disputed Domains to the website of his choosing. Only the domain name registrant or the registrant's authorized licensee can "use" a domain name for purposes of the ACPA. See 15 U.S.C. § 1125(d)(1)(D); Lockheed Martin Corp. v. Network Solutions, Inc., 141 F.Supp. 2d 648, 655 (N.D. Tex. 2001) ("Lockheed II") (§ 1125(d)(1)(D) expressly limits the "uses" feature to domain name registrant or registrant's authorized representative). Moreover, the legislative history of the ACPA establishes that such conduct cannot be considered "use." See S. Rep. 106-140 at 8-9 (concept of "use" does not extend to uses of domain name made by those other than the domain name registrant, such as person who includes domain name as hypertext link on web page or as part of directory of Internet addresses).

Nor is there any evidence that the agreements between Go Daddy and the registrant gave Go Daddy a "license" to use the Disputed Domains. Go Daddy's contractual right to terminate service does not equate to a license to use the registrant's domain names, and

13

the fact that the registrant forwards the domain name through Go Daddy's systems does not create a reciprocal license for Go Daddy to use the registrant's domain names.

Finally, there is no evidence that Go Daddy had a bad faith intent to profit from Petronas' mark. The fact that the forwarding service was based on customer demand does not show intent to profit specifically from Petronas' mark, and, in addition, is based on a flawed premise – that Go Daddy profited from customers using its forwarding service. As Go Daddy did not charge for the forwarding service, it cannot be said to have profited from it. Moreover, Petronas' argument that Go Daddy sought to profit by establishing immunity from liability is entirely untenable.

2. Contributory cybersquatting claim

Both parties have moved for summary judgment as to the claim for contributory cybersquatting. As an initial matter, Go Daddy argues that contributory cybersquatting is not a cognizable claim, as there is no mention of contributory liability in the ACPA, and because the ACPA's requirement of "bad faith intent to profit" distinguishes claims under the ACPA from ordinary trademark infringement claims. Petronas responds that the claim does exist, based on the legislative history, and also based on the fact that a number of district courts have allowed claims for contributory cybersquatting to proceed (even though no court has ever found a defendant liable for contributory cybersquatting).

In general, district courts that have considered the matter have found that because the ACPA was enacted against the settled common law theories of contributory liability in the trademark context, a judicially-created claim of contributory cybersquatting would be valid. In line with these analyses, this court assumes for the sake of argument that contributory liability exists under the ACPA. See, e.g., Verizon California, Inc. v. Above.com, No. CV-11-0973 ABC, slip op. at 5-11 (C.D. Cal., July 13, 2011) (citing Microsoft Corp. v. Shah, No. C-10-0653 RSM, 2011 WL 108954 at *1-3 (W.D. Wash., Jan. 12, 2011); Solid Host, NL v. Namecheap, Inc., 652 F.Supp. 2d 1092, 1111-17 (C.D. Cal. 2009); Ford Motor Co. v. Greatdomains.com, 177 F.Supp. 2d 635, 646-47 (E.D. Mich. 2001)).

14

In the Ninth Circuit, one is liable for contributory trademark infringement when he has knowledge of another's infringement, and either materially contributes to or induces that infringement. Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 795 (9th Cir. 2007) (summarizing other Ninth Circuit and Supreme Court formulations of "same basic test" for contributory infringement liability); see also Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 984-85 (9th Cir. 1996) (defendant providing service rather than product contributorily infringes when he exercises "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark"); see also Solid Host, 652 F. Supp. 2d at 1112 (under extent-of-control theory plaintiff must prove defendants had knowledge and direct control/monitoring of infringing instrumentality).

In addition, the existence of direct infringement is a necessary element of a claim for contributory infringement. Perfect 10, 494 F.3d at 795; see also Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883 (6th Cir.2004) ("Without proof of direct infringement there can be no liability for contributory infringement"); Georgia-Pacific Consumer Prod. LP v. Myers Supply, Inc., 2009 WL 2192721, *4 (W.D. Ark. July 23, 2009), aff'd 621 F.3d 771, 774 (8th Cir. 2010) (upholding summary judgment of no contributory infringement where underlying behavior did not constitute direct infringement).

Go Daddy argues that it did not have any knowledge that the registrant was cybersquatting, and there are no "special circumstances" that would justify imputing to Go Daddy knowledge that the registrant registered the Disputed Domains with a bad faith intent to profit from Petronas' mark. Go Daddy contends that a registrar is not normally expected to ascertain the good or bad faith intent of its registrants, and that it is well established that a demand from a trademark owner is not sufficient to cause such knowledge to be imputed. More to the point, Go Daddy asserts, discovery has closed, and Petronas has obtained no evidence to establish that the registrant had the necessary bad faith intent to profit from Petronas' marks in registering the Disputed Domains, which is required to establish direct cybersquatting on the part of the registrant.

In addition, Go Daddy argues, there is no evidence that Go Daddy induced the

15

registrant of the Disputed Domains to engage in cybersquatting, or any evidence that Go Daddy engaged in "direct control and monitoring" of the alleged cybersquatting. Go Daddy contends that a registrar cannot be expected to monitor millions of domain names a year to determine whether the domain names include a trademark, and if so, to determine the registrants' authorization and intent.

In opposition, and in support of its own motion, Petronas contends that evidence of the registrant's cybersquatting is overwhelming and was known to Go Daddy. With regard to Go Daddy's argument that there is no evidence of the registrant's "bad faith" intent to profit, Petronas contends that in light of the court's two judgments in the in rem cases – based on a finding that the Disputed Domains are confusingly similar to Petronas' trademark – and also in light of the failure of the registrant or Go Daddy to point to any valid reason for the registrant's use of the Disputed Domains to direct Internet traffic to a porn website also owned by the registrant – it is reasonable to "infer" that the registrant acted with a bad faith intent to profit.

Petronas also argues that the notion that discovery is needed in order to determine the registrant's bad faith is "based on an extremely naïve assumption, namely that the registrant would admit his bad faith intent," and that in any event, it was unable to seek discovery from the registrant because it was never successful in locating him.

Petronas asserts that it is undisputed that the registrant of petronastowers.net engaged in direct cybersquatting, from May 2, 2009, to August 30, 2010, by using Go Daddy's domain name forwarding service to direct Internet traffic from the domain name petronastowers.net to a pornographic website. Petronas contends that six of the nine factors identified in the ACPA as indicative of a registrant's bad faith, see 15 U.S.C. § 1125(d)(1)(B((i), are met with regard to this registrant.

Petronas argues that Go Daddy's domain name forwarding service was the instrumentality used by the registrant to engage in direct cybersquatting, and that Go Daddy "should have known" that the registrant was using its domain name forwarding service to engage in cybersquatting, or was willfully blind to it, given that Go Daddy knew

16

the identity of the registrant accused of cybersquatting. Petronas contends that Go Daddy had information (provided by Petronas' counsel) regarding the alleged cybersquatting, but that it nevertheless deliberately "refused to investigate" whether the registrant was committing cybersquatting.

Petronas argues that Go Daddy exercised direct control and monitoring of its domain name forwarding service, as it is undisputed that Go Daddy employees wrote the code and created the software application that implemented Go Daddy's domain name forwarding service, and that it was implemented with servers owned and controlled by Go Daddy. Moreover, Petronas asserts, Go Daddy was able to monitor the operation of its domain name forwarding service as to petronastowers.net, and to determine where the Disputed Domains were being forwarded.

The court finds that Go Daddy's motion must be GRANTED and Petronas' motion must be DENIED. A claim for contributory cybersquatting does not exist under the circumstances of this case, as a company providing an Internet routing service does not exercise the type of direct control and monitoring that would justify recognition of a contributory infringement claim. See Lockheed, 194 F.3d at 980.

Based on the evidence presented, the court is satisfied that the service at issue here – domain name forwarding – is a form of routing. Permitting a contributory cybersquatting claim based on a forwarding service cannot be squared with the Ninth Circuit's rejection of such a claim based on the same conduct in the context of traditional trademark infringement (as opposed to cybersquatting).

Further, Go Daddy did not exercise "direct control and monitoring" over the alleged cybersquatting. Domain name registration and routing are services routinely provided by registrars, and cannot be considered the type of direct control over the use of the mark that is required for the application of secondary liability principles. There is no evidence that Go Daddy had any control over the registrant when he registered the Disputed Domains, or when he used the forwarding service.

What is most significant, however, is that Petronas' evidence is inadequate to

17

establish cybersquatting by the non-party registrant. In particular, there is no evidence that can establish the registrant's "bad faith intent to profit" from Petronas' mark. Arguably, the fact that the registrant arranged to have Internet traffic directed from the Disputed Domains to a pornographic website is sufficient to show some variety of bad faith. However, the record is silent as to the intent of the registrant – that is, there is absolutely no evidence of bad faith <u>intent to profit</u> from Petronas' mark.

It is not enough to say that one can "infer" a bad faith intent to profit, even were such an inference sufficient to establish that element of the claim. One could just as easily infer a bad faith intent to create mischief, or a bad faith intent to annoy the owner of the Petronas mark. Because Petronas has failed to present evidence sufficient to support all the statutory elements of a claim of direct cybersquatting, it cannot show that Go Daddy engaged in contributory cybersquatting.

3. Unfair competition claims

GoDaddy seeks summary judgment as to the unfair competition claims, arguing that there can be no claim for unfair competition in the absence of a viable cybersquatting claim. Petronas does not oppose the motion. As the unfair competition claims are dependent on the cybersquatting claims, the motion must be GRANTED.

4. Counterclaim

In support of its Lanham Act claims, Petronas relies on U.S. trademark registration Reg. No. 2969707, for the mark PETRONAS AND DESIGN. In its motion for summary judgment as to its counterclaim, Go Daddy argues that the Petronas mark is invalid based on abandonment and use exceeding the scope of the registration, and that the registration should therefore be cancelled.

The Lanham Act gives federal courts authority to cancel an invalid trademark registration. 15 U.S.C. § 1119; <u>see also</u> <u>Central Mfg., Inc. v. Brett</u>, 492 F.3d 876, 883 (7th Cir. 2007) (where a registrant's asserted rights to a mark are shown to be invalid, "cancellation is not merely appropriate, it is the best course"). Indeed, a court must cancel a registration after finding the underlying mark is unenforceable. <u>Gracie v. Gracie</u>, 217

18

F.3d 1060, 1065-66, 1072 (9th Cir. 2000).

Federal courts may cancel registrations based on the same grounds that would be applied by the U.S. Patent and Trademark Office ("USPTO"). D. & M. Antique Imp. Corp. v. Royal Saxe Corp., 311 F. Supp. 1261, 1268 (S.D.N.Y. 1969). One such ground is abandonment. 15 U.S.C. § 1064(3). Another ground is violation of the Lanham Act provision concerning trademark registrations based on international conventions. Marmark Ltd. v. Nutrexpa S.A., 12 U.S.P.Q.2d 1843, 1845 (T.T.A.B. 1989).

In opposition, Petronas argues that Go Daddy lacks standing to seek cancellation of the mark. "[A] petition to cancel a registration of a mark . . . may . . . be filed by any person who believes that he is or will be damaged by the registration of the mark." 15 U.S.C. § 1064. In order to show standing to seek cancellation, a petitioner must show a rational basis for his belief that he would be damaged by the registration sought to be cancelled, "stemming from an actual commercial or pecuniary interest in his own mark." Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 735 F.2d 346, 349 (9th Cir. 1984); see also Halicki Films, LLC v. Sanderson Sales and Marketing, 547 F.3d 1213, 1228-29 (9th Cir. 2008).

Petronas contends that Go Daddy has conceded that it has no commercial interest in any Petronas trademark, and that it does not claim ownership in the mark. Thus, Petronas asserts, Go Daddy cannot show that it has standing to seek cancellation of the mark. Petronas argues further that even if Go Daddy had standing, there is no evidence of abandonment, and that Go Daddy has not pointed to any evidence that would support cancellation.

The court finds that the motion must be DENIED. As an initial matter, it appears that Go Daddy has standing to seek cancellation because Petronas is using the registration as a sword against Go Daddy, in that this Lanham Act lawsuit is premised on the registered mark. See World Market Center Venture, LLC v. Texas Int'l Prop. Assocs., 2009 WL 3303758, at *3 (D. Nev. Oct. 14, 2009) ("being sued for infringement . . . is sufficient to support standing for a counterclaim for cancellation"); Roxbury Entm't v. Penthouse Media Group, Inc., 2009 WL 2950324, at *3 (C.D. Cal. Apr. 3, 2009). Thus, because Go Daddy is

in danger of being financially affected by Petronas assertion of its mark – even though Go Daddy does not meet the traditional qualification of a party that claims a right to use the name in the mark – Go Daddy has arguably established standing.

However, the questions whether Petronas has abandoned the mark and whether its use exceeds the scope of the underlying registration – as briefed by the parties – are less clear, not least because the court was unable to locate a number of the documents referenced in the papers. The Ninth Circuit has adopted the maxim that "[j]udges are not like pigs, hunting for truffles buried in briefs." Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)). The court finds, at a minimum, that there are disputed factual issues regarding the extent of any abandonment and/or use of the mark by Petronas.

## CONCLUSION

In accordance with the foregoing, Go Daddy's motion for summary judgment is GRANTED as to the causes of action alleged in the FAC, and is DENIED as to the counterclaim for cancellation of registration. Petronas' motion for partial summary judgment on the contributory cybersquatting claim is DENIED.

The court will conduct a case management conference on Thursday, January 12, 2012, at 2:00 p.m., to discuss setting the counterclaim for trial, unless Go Daddy advises the court no later than 48 hours prior to the CMC that it intends to dismiss the counterclaim or that the dispute has otherwise been resolved.

**IT IS SO ORDERED.**

Dated: January 3, 2012

PHYLLIS J. HAMILTON
United States District Judge